AARON D. FORD
  Nevada Attorney General
D. RANDALL GILMER (Bar No. 14001)
  Chief Deputy Attorney General
State of Nevada
Office of the Attorney General
555 East Washington Avenue, Suite 3900
Las Vegas, NV 89101
(702) 486-3427 (phone)
(702) 486-3773 (fax)
drgilmer@ag.nv.gov
*Specially Appearing as Attorneys for*
*Warden Howell and NDOC*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MARCELL WILLIAMS,<br><br>                    Plaintiff,<br><br>vs.<br><br>WARDEN OF SOUTHERN DESERT<br>CORRECTIONAL CENTER, et al.,<br><br>                    Defendants. | CASE NO. 2:20-cv-00639-RFB-BNW<br><br>**SPECIAL APPEARANCE BY<br>RESPONSE AND OPPOSITION TO<br>PLAINTIFF'S MOTION FOR<br>PRELIMINARY INJUNCTION AS<br>DIRECTED BY THE COURT ON<br>APRIL 3, 2020** |

The Office of the Attorney General, as counsel for the Nevada Department of Corrections, and anticipated counsel for Jerry Howell (Warden Howell), the current warden of Southern Desert Correctional Center (SDCC),[1] by and through counsel, Aaron D. Ford, Attorney General of the State of Nevada, and D. Randall Gilmer, Chief Deputy Attorney General, hereby specially appear as ordered by the Court on April 3, 2020 for the limited purpose of providing a response in opposition to Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order filed April 3, 2020 (ECF No. 1).

. . .

. . .

---

[1] Warden Howell is the current warden of SDCC. Based on the Court's Order of April 3, 2020, the Office of the Attorney General contacted Warden Howell, who has provided us with permission to represent him for purposes of this response and any hearing the Court may desire regarding this issue. By providing this special appearance, neither the Officer of the Attorney General, the Nevada Department of Corrections, nor Warden Howell, waive the mandatory screening requirements of the Prison Litigation Reform Act (PLRA) as it relates to the underlying Complaint filed by Plaintiff (ECF No. 2–1).

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

The Nevada Department of Corrections (NDOC) has taken early and aggressive action with regard to the COVID-19 pandemic gripping the world.  These actions of limiting transfers to and from institutions, screening all individual for COVID-19 signs and symptoms before entry and precluding entry should there be any potential for concern or positive indicators present, reminding inmates of the need to adopt social distancing, ensuring proper cleaning and sanitization of the institutions, and—to the best of NDOC's knowledge–being the first correctional department in the nation to ban in-person access to all institutions state-wide to all individuals except for employees and essential vendors. Indeed, based on NDOC's aggressive and proactive steps, other correctional institutions throughout the nation have contacted NDOC executive leadership team for input and guidance as to what steps NDOC has taken, and what steps those institutions should take, in an effort to control and limit the potential impact of COVID-19 on correctional institutions across the country.

In addition to taking these aggressive first steps, NDOC's executive leaders, particularly the medical and operational staffs, are constantly reviewing the Center for Disease Control and other medical and governmental entity guidelines regarding COVID-19. To date, the actions taken by the NDOC have prevented any inmate from showing signs of coronavirus exposure.

While it is no guarantee that this pandemic that has (as of the date of this writing) currently infected at least 1.4 million people worldwide, nearly 400,000 people in the United States, and over 2,000 people in Nevada[2] will not eventually reach within the walls of SDCC or other NDOC institutions, NDOC's current safety and screening protocols have thus far prevented COVID-19 from spreading within Nevada's prison population.  To be clear, as of the date of this response, there are no confirmed COVID-19 cases within the NDOC prison population.  And there have only been four confirmed cases of COVID-19 among correctional officers—all of whom have been placed on sick or administrative leave

---

[2] *See* https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd4029942346 7b48e9ecf6, last accessed April 7, 2020.

until the virus is no longer present in their system. In addition, the individuals—staff and inmates—who had contacted with those four correctional employees have been quarantined to minimize potential spread of the virus.

The progressive steps the NDOC has taken to protect its employees, vendors and inmates from the spread of COVID-19, coupled with the ever-evolving nature of the recommendations provided by governmental entities and medical experts establish both why an injunction neither required nor prudent. The NDOC needs to be able to continue its progressive and aggressive actions to stay ahead of this pandemic. Any injunction requiring the NDOC to do or refrain from doing something would by its nature limit the NDOC's ability to remain agile and flexible in taking recommended steps to prevent (and if necessary, limit) a COVID-19 outbreak within the NDOC.

Accordingly, Williams' injunctive relief request should be denied.

## II.    PROCEDURAL BACKGROUND

### A.    Williams' Requested Relief

Williams—without filing an emergency grievance—has sought this Court's intervention with regard to the steps NDOC in general, and Warden Howell specifically, have put into place in order to combat COVID-19.[3] Namely, Williams is seeking the extraordinary relief of an injunction seeking to order the NDOC to:

    (1)    "deep clean every unit until coronavirus in contained;"

    (2)    require correctional officers to wear personal protection equipment such as gloves and masks?

    (3)    follow the Surgeon General's guidelines;

    (4)    "constantly screen" and test every correctional officer and inmate; and

    (5)    provide cleaning supplies to everyone at SDCC.[4]

Williams sought this relief with the Court on March 29, 2020, the Court entered the motion and correlating Complaint on April 3, 2020.[5]

---

[3] ECF No. 1; *see also* ECF No. 2–1.
[4] *Id*. at 2.
[5] ECF No. 1; ECF No. 2–1.

### B.    The NDOC's COVID-19 Preventive and Mitigating Measures

Beginning in February 2020, the NDOC took proactive and progressive steps to hopefully prevent, and at the very least limit the spread, of the coronavirus and COVID-19 within NDOC facilities.

On February 29, 2020, Dr. Michael Minev,[6] emailed medical staff, deputy directors and wardens seeking "a full inventory of protective equipment at all" NDOC facilities, specifically referencing face masks, including N95 and other protective masks, "disposable gowns and booties, latex gloves," and "oxygen tanks."[7]  The email also sought information regarding the ability to house inmates in open areas of the institutions should the need to arise to quarantine "dozens if not hundreds of individuals with suspected infections."[8] The email also referenced the need to ensure that NDOC has "enough bleach and Cavicide[9] available to completely disinfect every facility in the state."[10]

Dr. Minev sought this information within two days of NDOC receiving an email from the Governor's Chief of Staff regarding readiness and preparedness[11]–and less than three weeks after the Nevada Department of Health and Human Services, based on information provided by the Center for Disease Control (CDC), continued to "believe the immediate risk to the public in Nevada, and nationwide, continues to be low."[12] In seeking this information, Dr. Minev made clear that this was being done as a proactive measure "given the speed

---

[6] NDOC Medical Director, Declaration of Michael Minev at 1, ¶1, attached as **Exhibit B**.

[7] Email from Dr. Minev, dated February 29, 2020 at 9:08 P.M., attached as **Exhibit A, NDOC-COVID000012; Ex. B at 1-2, ¶ 2.**

[8] *Id.*

[9] Cavicide is an intermediate-level surface disinfectant that is effective against TB, HBV, HCV, viruses (hydrophilic and lipophilic), bacteria (including MRSA and VRE) and fungi. *See* https://www.metrex.com/en-us/products/surface-disinfectants/cavicide; *see also* https://www3.epa.gov/pesticides/chem_search/ppls/046781-00012-20171002.pdf, accessed on 4/7/20.

[10] *Id.*

[11] *Id.* at NDOC-COVID000014–15; Declaration of Veronica Austin at 1, ¶ 3, attached as **Exhibit C**.

[12] **Ex. A, NDOC-COVID000016.**

with which this virus is infected [] surrounding states" and to ensure that the NDOC was ready due to the "logistics of [its] facilities."[13]

On March 2, 2020, Chief of Nursing, Theresa Wickham, sent an email advisory "to all NDOC employees" regarding the coronavirus.[14] That email contained a CDC advisory educating the NDOC employees and all patients (e.g., the inmates) as to what COVID-19 is, how it is spread, and what preventive measures to take "to help prevent the spread."[15]

On the same day, Christina Leathers, NDOC's Human Resources Chief, sent an all employee email noting that "NDOC has been actively monitory the progress and status of the Coronavirus" and that the Emergency Response Manual referenced in AR 107.2.N, § XIV, Medical Emergencies,[16] should be utilized by all institutions.[17]

The employee bulletin also noted that NDOC had developed a protocol that included:

(1)     educating the employees, inmates, visitors and contractors through the use of email and preventive posters;

(2)     ensuring that medical staff would above N95 makes as appropriate;

(3)     access to clinical masks as appropriate;

(4)     the need to wash hands for a minimum of twenty (20) seconds and access to non-latex gloves;

(5)     the need to sanitize all contact surfaces with a 10% bleach concentration "*immediately following any outside contact;*" and

. . .

. . .

. . .

---

[13] *Id.* at NDOC-COVID000012.

[14] *Id.* at NDOC-COVID000009; **Ex. C at 1, ¶ 3**; Declaration of Theresa Wickham at 1-2, ¶ 2, attached as **Exhibit D**.

[15] **Ex. A, NDOC-COVID000010; Ex. C at 1, ¶ 3; Ex. D at 1–2, ¶ 2.**

[16] Administrative Regulation 107 is attached as **Exhibit E**; Declaration of Christina Leathers at 2, ¶ 3, attached as **Exhibit F**.

[17] **Ex. A, NDOC-COVID000007; Ex. F at 1-2, ¶ 3.**

(6)    the screening of incoming and outgoing employees at shift changes and inmates during train-in/out.[18]

Based on the March 2, 2020 emails, screening of staff, inmates and vendors began on March 3, 2020.[19] These screening procedures were implemented for vendors to the institution on the same day].[20]    Finally, the email contained a link to the CDC poster, entitled *Stop the Spread of Germs*, with instruction that the information be posted "in all areas visible for employees, inmates, visitors and contractors, including restrooms, housing units and public areas."[21]

Also on March 2, 2020, Dr. Minev emailed all relevant NDOC leadership individuals instructions to ensure that all "individuals or inmates with symptoms of suspected coronavirus infection" be asked whether they had traveled to Italy, South Korea, Iran, China or Japan as travel to those countries was specified by the CDC as a reason to take extra precaution.[22]

On March 13, 2020, Dr. Minev emailed an important COVID-19 update to medical staff, executive staff, and all wardens, directing that it be provided to all NDOC staff.[23] In that email, which was provided to all staff as requested, Dr. Minev reminded all staff that NDOC was "continuing to monitor all of [its] facilities with the most up to date information from the CDC and local health districts."[24]

Staff was also instructed to "IMMEDIATELY" email him, Chief Wickham, and Miguel Forero, a disease specialist employed by NDOC, if they are experiencing any flu like

---

[18] **Ex. A, NDOC-COVID000007; Ex. F at 1-2, ¶ 3.** Due to the importance of this issue, Chief Leathers also re-sent her March 2, 2020 email to all staff on March 13, 2020. **Ex. A, NDOC-COVID000001-2.**

[19] **Ex. B at 2, ¶ 6.**

[20] **Ex. A, NDOC-COVID000008; Ex. F at 1-2, ¶ 3.**

[21] *Id.*

[22] **Ex. A, NDOC-COVID000005; Ex. B at 1-3, ¶¶ 2, 7.**

[23] **Ex. A, NDOC-COVID000003–4; Ex. B at 1-3, ¶¶ 2, 7.**

[24] **Ex. A, NDOC-COVID000003.**

symptoms such as a "fever of 100.4 and above, cough, sore throat, muscle aches, etc.," if they "have come in contact with an individuals with these symptoms or known COVID-19 infection" or if they have "recently traveled to an area known to active COVID-19 infections."[25]

Dr. Minev did not seek this information simply for the sake of knowing. Rather, the email noted that the information was necessary to give the NDOC "an opportunity to investigate and decide on the next course of action in terms of necessary testing and clinical advice."[26] It was made clear that the information would be tracked so NDOC would be able to direct "resources in an efficient manner."[27] Dr. Minev also confirmed that NDOC would use the guidelines set forth by the CDC and Nevada Department of Health and Human Services (DHHS) regarding what steps would be used "in regards to COVID19 testing if it is needed."[28]   And finally, Dr. Minev again reminded all staff of steps to limit risk of infection, including:

> (1)    cancelling travel;
>
> (2)    not attending meetings with "large congregations of people;"
>
> (3)    avoid in-person meetings by utilizing phone and video conference services;
>
> (4)     by "non-essential visitors to the organization;" and
>
> (5)    a reminder of "common sense prevention measures," such as hand-washing, surface cleaning, social distancing measures, avoiding head or face contact with your hands, staying home when sick, and working remotely if possible.[29]

As it pertains to sanitizing, Warden Howell has confirmed that at SDCC, all staff is instructed to clean all housing units with the approved sanitization product at least once

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.* at NDOC-COVID000003–4.

every two (2) hours, the dining rooms and gym after every use, in maintenance areas and by maintenance staff once every hour, and all entry doors once every two hours.[30]  While these are the minimums ordered by Warden Howell, the minimums are generally exceeded.[31]

On March 16, 2020, Director Daniels not only reiterated the instructions previously provided by Dr. Minev and the medical team, but was able to implement additional directives due to Nevada Governor Steve Sisolak's Emergency Directive 003.[32] That memorandum made clear that NDOC had promulgated the following proactive preventive protocols:

- Suspending all inmate visitation;

- Permitting attorney visits by video or telephone conference only;

- Town Hall meetings with staff and inmates at each institution;

- Symptom detection that include visual and temperature checks, with anyone having a 100.3 or higher temperature being denied entry;

- Suspended all inmate access to the community; and

- Activated an Emergency Operation Center at each facility.[33]

A memorandum from Deputy Director of Operations Harold Wickham also dated March 16, 2020, provided additional information regarding how the Emergency Operation Centers were expected to be established and utilized.[34] Deputy Director Wickham also noted that the town hall meetings were to take place two times per week.

---

[30] Declaration of Warden Howell at 3, ¶ 7, attached as **Exhibit G**.

[31] *Id.*

[32] **Ex. A, 3/16/2020 Memorandum of Director Daniels, NDOC-CONVID000018**; Declaration of Director Daniels at 2, ¶ 6, attached as **Exhibit H**.

[33] *Id.*

[34] **Ex. A**, **NDOC-COVID000017**; Declaration of Deputy Director Harold Wickham at 2, ¶ 4 attached as **Exhibit I**.

1      On March 18, 2020, Dr. Minev sent an all staff email reiterating that all staff must

2  "have their temperature taken by either nursing or custody staff upon entry to the facility,"

3  and that anyone with a temperature of 100.4 or above would "be sent home and may receive

4  additional evaluation."[35] It was made clear that these were not suggestions, but a "DIRECT

5  ORDER from Director Daniels to ALL NDOC employees until further notice."[36] Dr. Minev

6  also informed all NDOC staff that any staff member seen by a medical provider and tested

7  for COVID-19 would be quarantined for 14 days and  would not be permitted to return to

8  work until there was a confirmed negative test for COVID-19 and until the entire

9  quarantine period was completed.[37]

10      On March 19, 2020, Warden Howell ensured that inmates were again reminded of

11  the COVID-19 precautions by requiring that Coronavirus memo be posted in conspicuous

12  areas within SDCC—including housing units.[38] As the date of this filing, the March 19

13  memo remains posted in Williams' housing unit.[39] In addition to the memo, the information

14  is provided to the inmates via the closed circuit inmate television channel, where it runs

15  on a continuous loop.[40]

16      On April 2, 2020, Dr. Minev issued another all staff email for purposes of reiterating

17  the protocols that had been implemented.[41] There, it was again noted that all employees

18  must have their temperature taken before entry, and that "[c]ustody staff will ensure that

19  six (6) feet of distance between employees is enforced during screening."[42] Any employee or

20  vendor that exhibits one of the three most common COVID-19 symptoms of high

21

22  [35] 3/18/2020 Email from Dr. Minev, attached as **Exhibit J; Ex. B at 2, ¶ 2**.

23  [36] *Id.*

24  [37] *Id.*

25  [38] 3/19/2020 Memorandum, attached as **Exhibit K; Ex. G at 2, ¶ 5**.

26  [39] Photographs of 3/19/2020 Memorandum, attached as **Exhibit L**; **Ex. G at 2, ¶ 5**.

27  [40] **Ex. G at 2, ¶ 4**.

28  [41] 4/2/2020 Email of Dr. Minev, attached as **Exhibit M**; **Ex. B at 2, ¶ 2**.

[42] *Id.*

temperature, shortness of breath, or dry cough will be considered a COVID-19 PUI, or Person Under Investigation.[43] Individuals who are uncooperative with the screening process are not be permitted entry.[44] This screening is not discretionary.[45]

The protocol also made clear that consistent with CDC recommendation, any individual who tests positive for COVID-19 as well as those who had potential close contact with the positive individual, will be required to be quarantined for fourteen (14) days or until they are no longer sick, whichever time is longer, and that the person must be symptom free for 72 hours in addition to the quarantine.[46] Dr. Minev described close contact as anyone who has been within six (6) feet of the positive patient for a prolonged period of time.[47] This is the same description provided by the CDC.[48]

## C. Factual Responses to the Court's Questions

In responding to Williams' Motion, the Court directed the NDOC to provide answers to the following six items:

> In the response, Defendant shall detail what policies SDCC currently has in place to protect prison staff and inmates from the coronavirus. This response SHALL explain: a.) current protocols for testing of facility employees, b.) sanitizing protocols for all areas of the facility, c.) contingency protocols related to an employee and/or inmate testing positive for the coronavirus, d.) procedures for ensuring against infection from outside vendors bringing supplies to the facility, e.) whether any employees or inmates have tested positive for coronavirus, and f.) protocols and capacity for the facility to test employees and/or inmates for coronavirus.[49]

---

[43] *Id.*

[44] *Id.*

[45] **Ex. B at 2, ¶ 5**.

[46] **Ex. M**.

[47] *Id.*

[48] *Interim Guidance on Management of Coranavirus Disease (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#prevention, last accessed April 6, 2020, and attached as **Exhibit N.**

[49] ECF No. 4.

The NDOC, through Warden Howell, hereby provides the following factual responses to the Court's inquiries:

### 1.    Current Protocols For Testing of Facility Employees

All NDOC Employees have their temperature taken upon entry into the gatehouse at all institutions, and the temperature is recorded. All staff members must maintain a minimum of six (6) feet between them while awaiting screening so as to ensure that social distancing is maintained. In addition to temperature checks, employees are questioned about symptoms they may be experiencing, such as fever, cough, shortness of breath, wheezing, runny nose, etc. Employees are required to cooperate and failure to do so will result in the employee being denied entry to the institution.

If these symptoms are observed, employees are denied entry. They must remain symptom free for a minimum of 72 hours before being permitted entrance the facility. Should an employee test positive for COVID-19, they will not be permitted to return to work until after a 14-day quarantine, be symptom free for at least 72 hours, and a negative COVID-19 test is obtained.  This protocol applies to any individuals (inmates, employees or vendors) that had prolonged close contact with the COVID-19 patient.

These protocols are based on CDC recommendations.[50]

### 2.    Sanitizing Protocols

Prior to COVID–19, SDCC issued cleaning supplies weekly to inmates upon request.[51] Since the global pandemic, SDCC has increased cleaning supplies in the units and authorized staff to issue upon request as needed.[52] The Unit Officers are aware that should inmates run low on cleaning supplies they are to ask the cleaning/chemical supply officer in their unit or area, and more supplies will be provided.[53]

. . .

---

[50] **Ex. M; Ex. N**.

[51] **Ex. G at 2, ¶ 6**.

[52] *Id*.

[53] *Id*.

These supplies not only apply to cleaning supplies for the inmates living quarters, but also to personal hygiene. Warden Howell has instructed that inmates at SDCC be provided double the usual weekly amount of hand and body soap provided to inmates. He has also authorized staff to provide more hand and soap to the inmates should the double amount provided not be sufficient for the inmate's needs.[54]

In addition, all surfaces are sanitized with a 10% bleach concentration solution. At SDCC specifically, this sanitizing occurs at a minimum:

- once every two hours within the housing units and entry doors;

- after each use of the gym and dining; and

- once an hour by the maintenance staff and in maintenance areas.[55]

In addition to these COVID-19 sanitization procedures, SDCC staff and inmates are required to comply with the health, hygiene, and sanitization protocols of Operational Procedure (OP) 490.[56] As Warden Howell avers, and as evidenced by § 490.02(1) of OP 490, "[i]t is the responsibility of all staff directly involved in supervising a shop, housing unit or any other area . . . to maintain constant surveillance of that area to ensure acceptable sanitization practices are followed on a daily basis."[57] Staff are also empowered to provide "appropriate protective clothing . . . should reasonable precautions dictate the use of such clothing."[58] Inmates are expected and required to assist in these cleaning efforts by "maintain[ing] sanitary conditions, personal hygiene, and cleanliness," which includes using the "cleaning equipment or material issued to them."[59]

. . .

---

[54] *Id.*; *see also* Email Directive of April 3, 2020, attached as **Exhibit O**.

[55] **Ex. G at 3, ¶¶ 7, 9.**

[56] OP 490 is attached as **Exhibit P**; *see also* **Ex. G at 3, ¶ 8**.

[57] **Ex. G at 3, ¶ 8,** *citing* **Ex. P at 1, § 490.02(1).**

[58] **Ex. G at 3, ¶ 8,** *citing* **Ex. P at 2, ¶ 490.02(2).**

[59] **Ex. G at 3, ¶ 8,** *citing* **Ex. P at 2, ¶ 490.03(1).**

Also, as of April 8, 2020, the NDOC has authorized and issued hand sanitizing lotion for all inmates.[60]

### 3.    Contingency Plans for COVIC-19 Positive Tests

All primary and secondary individuals, either inmate, vendor or employee, who have been contact with a positive COVID-19 or presumptive positive COVID-19 patient are reviewed by the Medical Director (Dr. Minev), the Chief of Nursing (Theresa Wickham) and the Disease Control Specialist (Miguel Forero). Following a review by each of these individuals, the patient is informed to either immediately self-quarantine for 72 hours or 14 days, depending on the symptoms the patient is exhibiting.  For employees and outside vendors, this means they are not permitted access to the institution until cleared by NDOC medical staff. If an inmate, they are isolated from other inmates until cleared by medical personnel.[61]

### 4.    Protocols Regarding Outside Vendors and Inmates

The protocol used for employee access is also required to be followed by all vendors that may be permitted to enter any NDOC institution.[62]

1.    Likewise, the protocols for screening inmates is based on the CDC recommendations and those implemented for correctional officers. These protocols as adjusted for inmates requires all inmates transferring into any NDOC facility, whether from another NDOC facility or from outside the NDOC, to be medically observed and isolated from other inmates at the institution for a minimum of fourteen (14) days. Each institution has specifically identified locations for these observations. During this time, any symptoms that an inmate may have that are consistent with a potential COVID-19 infection, result in the inmate being quarantined from the other inmates until such time as COVID-19 can be ruled out. At Southern Desert Correctional Center, inmates are isolated in Unit 7, which is the quarantine and isolation unit. Any inmate that exhibits

---

[60] **Ex. I at 2, ¶ 5**.

[61] **Ex. B at 3, ¶¶ 7-8; Ex. G at 2-3, ¶ 8**.

[62] **Ex. B at 2, 4, ¶¶ 5, 12**.

symptoms consistent with a potential COVID-19 diagnosis are removed from Unit 7 and observed in the medical building until they are symptom free.[63]

In addition to these screening requirements, OP 490 requires inmates to "[r]eport all illness or disease" that may "require treatment."[64] *Id*.

### 5. Number of Positive COVID-19 NDOC Patients

As of April 8, 2020, <u>no inmates have tested positive for COVID-19</u>.[65] Meanwhile four (4) NDOC employees have tested positive and are therefore currently in quarantine for a minimum of 14 days, until no symptoms are present for at least 72 hours, and until a negative COVID-19 test is obtained and the employee is cleared by medical personnel.[66]

### 6. Testing Protocols

In addition to the information referenced in response to Question No. 1 above at 9:23–10:12, nursing and dental staff have been assigned to assist with temperature checks and assessments. In addition to these assessments, the NDOC has a significant supply of COVID-19 test kits that are reserved to test for inmates who may have been exposed to COVID-19. As of April 8, 2020, the NDOC medical team has used its collective medical judgment to use these test kits on seven (7) inmates.[67] There have been no positive tests.[68]

In addition to testing inmates when medically sound to do so, all inmates are isolated and observed from NDOC inmates upon intake from either outside the NDOC system or based on transfer to a different NDOC institution. (although internal transfers have been extremely curtailed and only used when legally or medically necessary). These additional safeguards are designed to guard against the spread of COVID-19 should it be introduced by a new inmate.

---

[63] **Ex. B at 2, ¶ 8; Ex. D at 2, ¶ 6; Ex. G at 2-3, ¶ 8**.

[64] **Ex. G at 3, ¶ 8,** *citing* **Ex. P at 2, § 490.03(1)**.

[65] **Ex. B at 3, ¶ 9; Ex. D at 3, ¶ 7**.

[66] **Ex. M**.

[67] **Ex. B at 3, ¶ 9; Ex. D at 3, ¶ 7**.

[68] **Ex. B at 3, ¶ 9; Ex. D at 3, ¶ 7**.

III.   **LEGAL STANDARD REGARDING INJUNCTIVE RELIEF**

Injunctive relief, whether temporary or permanent, is an "extraordinary remedy, never awarded as of right." *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

Furthermore, under the Prison Litigation Reform Act ("PLRA"), preliminary injunctive relief must be "narrowly drawn," must "extend no further than necessary to correct the harm," and must be "the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2). The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.* "[T]here must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 635–36 (9th Cir. 2015).

IV.   **THE INJUNCTION SHOULD NOT BE GRANTED**

Williams is not entitled to injunctive relief as he is not likely to win on the merits of his underlying claims, cannot establish irreparable harm in the absence of this preliminary injunction, cannot establish that the balance of the equities tip in his favor, or that the injunction is in the public interest.

A.   **Williams Is Not Likely to Succeed on the Merits**

To establish an Eighth Amendment constitutional violation for allegedly failing to prevent harm, Williams must establish that the alleged deprivations, e.g., failure to take steps to prevent COVID-19 at SDCC, are objectively "'sufficient serious,' in that the inmate must show that he was incarcerated under conditions posing substantial risk of serious harm," and that "the official . . . acted with a 'sufficiently culpable state of mind.'" *Famer v. Brennan*, 511 U.S. 825, 834 (1994).

While not directly a medical indifference case, Williams' claims is best analogized to such a claim. In that regard, deliberate indifference is a high legal standard; a medical professional's mistake, negligence, or malpractice is not sufficient to constitute deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

Every claim by an inmate that he has not received adequate medical treatment does not constitute an Eighth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). *Id.* at 105. An inmate alleging deliberate indifference to serious medical need "must allege acts or omissions sufficiently harmful" to the inmate. *Id.* at 106.

Here, NDOC concedes that COVID-19 is a serious medical condition. However, NDOC also respectfully states that based on the guidance of its medical director, who has based his advice on rapidly-evolving CDC practices and protocols, Williams will not be able to establish that he is being housed under conditions posing a substantial risk of serious harm.

In this regard, NDOC has taken proactive and progressive steps to limit access to all institutions with the exception of essential personnel needed to ensure the safety and security of everyone within the walls of the institution. NDOC has also implemented stringent screening procedures of the individuals it does permit to enter the institutions. These procedures include visual and temperature checks upon entry, prohibiting entry to anyone who is showing symptoms of potential COVID-19, taken measures to sanitize common areas numerous times a day, and ensuring that officers, vendors, and inmates are quarantined, denied access, or isolated and observed away from other inmates when there is any question that the individual may have COVID-19 or may have been in close contact with someone who has been diagnosed with COVID-19.

To be sure, the protocols and procedures set forth above and through the documents and declarations attached to this response, are substantially similar to those the CDC published as interim guidance on March 23, 2020.[69] A review of the CDC guidance makes

---

[69] **Ex. N**, *Interim Guidance on Management of Coranavirus Disease (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#prevention, last accessed April 6, 2020.

clear the NDOC has used the same definition of someone who is considered to be in "close contact" with a COVID-19 patient[70] and relies on the same symptoms of fever, cough, and shortness of breath.[71] A review of the interim guidance from the CDC also notes the importance of hygiene, restricting travel and access, cleaning "several times per day," performing visual inspection and temperature checks for all individuals prior to entry into the institution, and ensuring that employees and other outside individuals are not permitted access after showing symptoms "for at least 72 hours) and that 14 days self-quarantines should be instituted in certain circumstances.[72]

In short, a review of the 21–page interim guidance from the CDC shows the substantial similarity between the progressive, proactive protocols instituted by NDOC and those recommended by the CDC for use in institutionalized settings. Given the reliance on the CDC protocols, Williams cannot establish either that NDOC has objectively placed him at harm or that they subjectively are aware of any harm.

## B.    Williams Cannot Establish Irreparable Harm

As the reliance on the CDC guidance establishes above, the NDOC has done implemented aggressive actions to safeguard against the introduction of COVID–19 into any of its institutions. Given the global pandemic has now infected over 1.4 million individuals worldwide, and over 2,000 in Nevada, NDOC's actions not only do not place Williams in a situation of irreparable harm, but arguably, are keeping him safer than non-institutionalized individuals. Specifically, during the last three weeks of March, all of which coincide with the current State of Emergency, there have been at least 170,596 Nevadans have filed for unemployment.[73] This is more than all of 2019.[74] Given these unprecedented

---

[70] *Compare* **Ex. N at 2–3 with Exs. A, J, and M**.

[71] *Id.*

[72] **Ex. N**.

[73] *See* https://www.rgj.com/story/news/money/business/2020/04/03/nevada-unemployment-claims-last-3-weeks-outpace-all-2019/2944315001/, last accessed April 7, 2020.

[74] *Id.*

1    unemployment numbers, it would be incredibly difficult for an inmate released at this time

2    to find gainful employment, find a residence, and be able to seek medical attention if they

3    require it once out.

4        **C.    The Equities Do Not Tip In Williams Favor**

5           The NDOC has shown that it is constantly reviewing and revising its COVID–19

6    protocols in an effort to stay ahead of the rapidly changing conditions faced globally. This

7    includes reliance on CDC and other governmental health guidance that changes on a

8    daily—if not hourly–basis.  It would be difficult, if not impossible, for this Court to fashion

9    injunctive relief in an order that would not, in some way, tie the hands of NDOC, which in

10   turn could prevent it from taking swift and decisive action to changing conditions. The

11   implementation of an injunction here would preclude the NDOC from taking the swift

12   action needed to stay ahead of this pandemic, and to implement what the CDC and other

13   health experts recommend. This is the type of micromanagement that the PLRA injunction

14   limitations is designed to avoid.[75]

15       **D.    The Public Interest Weighs Against Granting the Injunction**

16          Finally, the public interest weighs against granting the injunction. As noted above,

17   the NDOC has taken aggressive action, implemented progressive and proactive protocols,

18   and exhibited the ability to make changes and updates to its procedures and practices to

19   ensure that it is doing its level–best to keep COVID-19 from infecting inmates. Because

20   NDOC is taking its cue from the CDC and other governmental health organizations, and

21   has, thus far, successfully battled back this disease, the public interest does not weigh in

22   favor of granting the injunction. This is especially true when taking into account the

23   requirement that in the PLRA context, any injunctive relief must be "narrowly tailored" to

24   correct the harm. Here, no harm has been or can be shown.

25   **V.   CONCLUSION**

26          Williams has not and cannot establish any of the four necessary elements to obtain

27   an injunction. Perhaps most important, Williams cannot show any irreparable has come to

28

---

[75] *See generally Gilmore v. California*, 220 F.3d 987, 999 n. 14 (9th Cir. 2000).

him or any other inmate based on NDOC's current clinical procedures and practices. In addition, Williams cannot establish how the proposed injunctive relief would prevent him or other inmates from suffering irreparable harm in the future. Indeed, respectfully, given the current state of the pandemic outside the prison walls, and the lack of <u>any positive pandemic patient within the NDOC walls</u>, all current evidence suggests that the NDOC's actions to combat this pandemic is working to keep Williams and all of its inmates as safe as possible during these difficult days.

The preliminary injunction must be denied.

DATED this 8th day of April, 2020.

Respectfully submitted:

AARON D. FORD
Attorney General

By: /s/ *D. Randall Gilmer*
    D. Randall Gilmer (Bar No. 14001)
    Chief Deputy Attorney General
    *Specially Appearing as Attorneys for*
    *Warden Howell and NDOC*

1

## **CERTIFICATE OF SERVICE**

2

       I hereby certify that I electronically filed the foregoing document with the Clerk of

3

the Court by using the electronic filing system on the 8th day of April, 2020.

4

       I certify that some of the participants in the case are not registered electronic filing

5

system users.  In the instant case, the Court will serve on Southern Desert Correctional

6

Center via electronic service to the facility to the following:

7

Marcell Williams, #1120655
Southern Desert Correctional Center

8

P.O. Box 208
Indian Springs, NV 89070

9

10

11

12

   /s/ Traci Plotnick

13

Traci Plotnick, an employee of
the Office of the Attorney General

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INDEX OF EXHIBITS**

EXHIBIT A      —      NDOC–COVID000001-NDOC–COVID000019

EXHIBIT B      —      Declaration of Dr. Michael Minev

EXHIBIT C      —      Declaration of Veronica Austin

EXHIBIT D      —      Declaration of Chief of Nursing, Theresa Wickham

EXHIBIT E      —      Administrative Regulation 107

EXHIBIT F      —      Declaration of Christina Leather, Human Resources

EXHIBIT G      —      Declaration of Warden Jerry Howell, SDCC

EXHIBIT H      —      Declaration of Director Charles Daniels

EXHIBIT I      —      Declaration of Deputy Director Harold Wickham

EXHIBIT J      —      Email from Dr. Minev, dated 3/18/2020

EXHIBIT K      —      Warden Howell Memorandum, dated 3/19/2020

EXHIBIT L      —      Photographs of Williams' Housing Unit

EXHIBIT M      —      Email from Dr. Minev, dated 4/2/2020

EXHIBIT N      —      CDC Interim Guidance Handout Re: COVID–19

EXHIBIT O      —      Email Directive of Warden Howell, 4/3/2020

EXHIBIT P      —      SDCC Operational Procedure 490