AARON D. FORD
Nevada Attorney General
D. RANDALL GILMER (Bar No. 14001)
Chief Deputy Attorney General
MATTHEW P. FEELEY (Bar No. 13336)
State of Nevada
Office of the Attorney General
555 East Washington Avenue, Suite 3900
Las Vegas, NV 89101
(702) 486-3427 (phone)
(702) 486-3773 (fax)
drgilmer@ag.nv.gov
*Specially Appearing as Attorneys for
Warden Howell and NDOC*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

MARCELL WILLIAMS,

           Plaintiff,

vs.

WARDEN OF SOUTHERN DESERT
CORRECTIONAL CENTER, et al.,

           Defendants.

CASE NO. 2:20-cv-00639-RFB-BNW

**SPECIALLY APPEARING
DEFENDANTS' RESPONSE AND
OPPOSIITON TO PLAINTIFF'S
MOTION FOR TEMPORARY
RESTRAINING ORDER (ECF NO. 46)
AND MOTION FOR ORDER TO
SHOW CAUSE (ECF NO. 47) AS
DIRECTED BY THIS COURT ON
JULY 24, 2020 (ECF NO. 48)**

      The Office of the Attorney General, as counsel for the Nevada Department of Corrections, and anticipated counsel for the current and former wardens of Southern Desert Correctional Center (SDCC),[1] by and through counsel, Aaron D. Ford, Attorney General of the State of Nevada, D. Randall Gilmer, Chief Deputy Attorney General, and Matthew P. Feeley, Deputy Attorney General, hereby specially appear, as ordered by the Court on July 24, 2020,[2] in order to provide their opposition the *Motion for Temporary*

---

[1] The former warden of SDCC, Jerry Howell, is now the warden at Florence McClure Women's Correctional Center (FMWCC). The current warden of SDCC is William Hutchings, who was previously the warden at FMWCC. Warden Hutchings and Warden Howell took on their new roles and responsibilities on or about July 20, 2020.

[2] ECF No. 47; *see also* ECF No. 4.

*Restraining Order and Motion for Show Cause* filed by Plaintiff, Marcell Williams (Williams).

## I.    INTRODUCTION

As of July 28, 2020, one SDCC Inmate has tested positive for COVID-19. ONE!  This is an infection rate of .06% based on an inmate population of 1,584 inmates. By comparison, the worldwide infection rate as of July 28, 2020 is .21%[3]—nearly four times the NDOC inmate infection rate;  the United States infection rate is 1.3%[4]—or more than twenty times the NDOC SDCC inmate infection rate; and the Nevada infection rate of 1.4%.[5]

In addition, there are approximately 334 employees assigned to SDCC. Of these 334 employees, there have been five (5) COVID-19 tests as of July 28, 2020. This means that between all inmates and staff at SDCC, there is an infection rate of approximately .31%.[6] Stated another way, Williams has a 75% less chance of contracting COVID-19 at SDCC than he does in the United States as a whole.[7]

---

[3] Percentages calculated by dividing the total number of confirmed cases of COVID-19 patients in the world as reported by Johns Hopkins University at https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6, last accessed on July 28, 2020, by the total world population as constantly updated at https://www.worldometers.info/world-population/, last accessed at approximately 11:30 a.m. on July 28, 2020.

[4] Percentages calculated by dividing the total number of confirmed cases of COVID-19 patients in the United States as reported by Johns Hopkins University at https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6, last accessed on July 28, 2020, by the total United States population as constantly updated at https://www.worldometers.info/world-population/, last accessed at approximately 11:30 a.m. on July 28, 2020.

[5] Nevada percentage calculated by referencing the COVID-19 count set forth by the New York Times *Nevada Coronavirus Map and Case*, https://www.nytimes.com/interactive/2020/us/nevada-coronavirus-cases.html, last accessed on July 28, 2020, by the estimated Nevada population of 3,139,600 as reported at https://worldpopulationreview.com/states/nevada-population, last accessed July 28, 2020.

[6] 1,584 inmates +334 staff=1,918. Six COVID-19 cases divided by 1,918 equals .31%.

[7] Percentage calculated by dividing the total number of confirmed cases of COVID-19 patients in the United States as reported by Johns Hopkins University at https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6, last accessed on July 28, 2020, by the total United States population as constantly updated at https://www.worldometers.info/world-population/, last accessed at approximately 11:30 a.m. on July 28, 2020. *See also*, Wall Street Journal, Commentary, S. Kennedy, *You're More Likely to Cath Covid at Home Than in Jail*, published July 24, 2020, https://www.wsj.com/articles/youre-more-likely-to-catch-covid-at-home-than-in-jail-11595628804, and attached as **Exhibit 1**

System wide, as of July 28, 2020, there have been a total of twenty–two (22) NDOC inmates who have tested positive for COVID-19—an inmate infection rate of .179%[8]—nearly one tenth the infection of the United States and roughly 15% less than the global infection. The NDOC-wide infection rate of all staff and inmates is .629%[9]—less than half the infection rate of the United States and Nevada.[10]

Despite these objective statistics establishing NDOC's COVID-19 response success, by filing the instant motions Williams has shown his proclivity for the well-known proverb, "if at first you don't succeed, try, try again."[11]  Despite Williams' attempt to have this Court micromanage NDOC's COVID–19 response, just as it did on April 21, 2020,[12] this Court should again deny Williams' attempt. The NDOC also respectfully states that it is time for Williams to follow the version of the proverb made famous by W.C. Fields: "If at first you don't succeed, try, try again. Then quit. . . ."[13]

It is time to quit. The NDOC cannot be expected to respond to emergency preliminary injunction motions every time there is a minor change in the COVID–19 infection rate within NDOC. It is also a waste of judicial resources and this Court's time to be asked to weigh in and micromanage every potential COVID–19 response.

Williams' motions should be denied with prejudice.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

### A.    Williams' Requested Relief

Williams requests this Court "order the Defendants to (1) provide a medically appropriate course of action to fully capture and contain COVID-19 within SDCC walls"

---

(As Williams used Exhibit letters in this motion, NDOC is using Exhibit numbers for ease of identification).

[8] 22/12,260=.00179 or .179%. The 12,260 number is the total number of inmates tested as of July 24, 2020. *See* Declaration of M. Forero at 2, ¶ 3, attached as **Exhibit 2**.

[9] **Ex. 2 at 3, ¶ 10**.

[10] *See* nn. 6–7, *supra*.

[11]   https://www.phrases.org.uk/bulletin_board/5/messages/266.html,   last   accessed July 28, 2020.

[12] ECF No. 14.

[13]   W.C.   Fields,   https://www.goodreads.com/quotes/1312-if-at-first-you-don-t-succeed-try-try-again-then, last accessed July 28, 2020.

and (2) requiring SDCC to test all inmates that "are exposed to hazardous persons," which presumably means individuals who have tested positive for COVID–19.[14] Williams also asks this "Court to restore and maintain a health and safe environment."[15]

### B.    The NDOC's COVID-19 Preventive and Mitigating Measures

On April 8, 2020, the NDOC provided this Court with detailed descriptions of its COVID-19 protocols and mitigation strategies.[16]  Additional clarification and information was provided in this case on April 13, 2020[17] and during oral argument held on April 16, 2020.[18] The NDOC has also provided this Court with either daily or weekly under seal updates regarding any positive COVID-19 cases of either staff or employees throughout the NDOC system.[19] While Williams is not privy to those under seal filings, on July 16, 2020, this Court "assure[d] Mr. Williams that" "Defendants have been complying with the Court's order and have been filing the requested information with the Court under seal."[20]

In addition to the various filings made in the instant case, the NDOC provided updated protocol information to this Court in the related case styled *Kerkorian v. State of Nevada Department of Corrections et al.*, Case No. 2:20–cv–00950–RFB–BNW. Specifically, on June 12, 2020,[21] this Court was provided the following additional information regarding NDOC's protocols to keep its inmates safe:

> (1)    Access to hand sanitizer;[22]
>
> (2)    All staff wearing Personal Protective Equipment (PPE);[23]

---

[14] ECF No. 47 at 4:15–18; *see also id.* at 1:21–23. The instant motions were filed at both ECF No. 46 and ECF No. 47 as it seeks two different types of relief. For ease of reference, NDOC will refer to only ECF No. 47.

[15] ECF No. 47 at 1:22–23.

[16] ECF Nos. 5–6 at 4:1-14:22; *see also* ECF Nos. 6–1—6–17.

[17] ECF No. 9—ECF No. 9–5.

[18] ECF No. 13.

[19] *See* ECF Nos. 16–27, 30–33, 35–38, 40, 44–45 (under seal filings).

[20] ECF No. 43.

[21] *Kerkorian*, ECF No. 18, filed 6/12/2020, attached as **Exhibit 3** (without exhibits).

[22] *Kerkorian*, ECF No. 18 at 6:7–13.

[23] *Id.* at 6:15–17.

(3)    Use of N-95 Masks when appropriate;[24]

(4)    All inmates being issued masks;[25]

(5)    The current status of quarantine and return to work procedures;[26]

(6)    Noting that all inmates and staff were being tested for COVID–19;[27]

(7)    Testimonials of Two Nevada Sentencing Commission Members;[28] and

(8)    Information regarding NDOC's Emergency Operation Procedures.[29]

NDOC fully incorporates by reference all of these protocols and procedures as if fully set forth herein.

### C.    Additional System Wide Testing Began on July 26, 2020

On Sunday, July 26, 2020, the NDOC began a second round of testing at FMWCC COVID–19 testing.[30]  An additional second round of testing at all institutions will begin in August 2020.[31] As with the first round of system–wide testing, all inmates will be tested at each institution.[32] The NDOC plans to test a minimum of one institution per month beginning in August 2020 with a goal of finishing at all testing of inmates in February 2021.[33] At that point, a one month break in random testing is anticipated, with another round of monthly testing commencing in April 2021 with a proposed completion date of October 2021.[34]

In addition, moving forward, beginning in August 2020, all staff members will be tested once every two weeks as a matter of course.[35]

---

[24] *Id.* at 6:19–7:2.

[25] *Id.* at 7:4–20.

[26] *Id.* at 8:1–9:6.

[27] *Id.* at 9:7–17.

[28] *Id.* at 9:18–11:9.

[29] *Id.* at 11:10–12.

[30] **Ex. 2 at 3, ¶ 13**.

[31] *Id.* at 3–4, ¶ 14.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* at 4, ¶ 16.

**D.    Response to Williams' Allegations and Declarations**

In addition to the above information that is a direct response to Williams' unwarranted concerns, NDOC provides the following specific response to William's assertions:

**1.    One Inmate At SDCC Has Tested Positive**

NDOC confirms that the inmate named by Williams has tested for COVID–19.[36] Indeed, this Court was made aware of this positive inmate test on July 17, 2020.[37]

**2.    The Inmate's Close Contacts Were Tested**

As noted in that under seal filing:

> Regarding the inmate who tested positive at SDCC (the first positive inmate test at that institution), the inmate is tested positive on July 11, 2020. The inmate was housed in the same unit for a short period of time prior to the inmate's positive COVID-19 test. [However, he and Williams were not housed together, as the unit is] a "lockdown" unit where all individuals are housed separately. All staff are also mandated to wear masks at all times and maintain social distancing. As a result of the positive test, the inmate was transferred to the medical unit at SDCC, where he has been placed in isolation. The individual arrived at NDOC in February 2020 and has been housed at SDCC since May 19, 2020. In addition to retesting all individuals within the [one of the] inmate's housing unit, all staff and offenders exposed to the inmate have been identified, quarantined, and tested. Mr. Williams was previously tested for COVID- 19, with a negative test result being obtained on July 6, 2020.[38]

While this information was correct when provided to the Court on July 17, 2020, it was also unfortunately incomplete. The inmate who tested positive on July 11, 2020 was housed in two different units since arriving at SDCC.[39] The first unit, Unit 6, is a general

---

[36] While Williams has used the inmate's name, and the inmate has allegedly informed Williams that his name may be publicly identified, the NDOC will refrain from using the inmate's name until such time as it can be explicitly verified that the inmate is agreeable to his name being placed in the public record.

[37] ECF No. 44 at 2:9–20.

[38] ECF No. 44 at 2:9–20.

[39] **Ex. 2 at 2, ¶¶ 5–6**.

population unit.[40]  All inmates in that unit were retested following the inmate's positive test.[41] This testing occurred on July13, 2020.[42] All inmates tested negative for COVID–19.[43]

### 3.    Inmates in Unit 8 With Symptoms Were and Will Be Tested

On July 1, 2020, the COVID–19 positive inmate was transferred to Unit 8, the same unit where Williams is currently housed. Unit 8 is a lockdown unit where all inmates are housed separately.[44] As Unit 8 is a segregated unit, Williams—as all other inmates within Unit 8—do not have the opportunity to congregate together and therefore each inmate is forced to practice social distancing.[45] All inmates in Unit 8 eat their meals in their cell.[46] All inmates in Unit 8 have individual recreation time that occurs in a one-person outdoor fenced in area.[47]

Therefore, because inmates housed in Unit 8 do not have the opportunity to have close contact with each other, only inmates who showed COVID-19 symptoms were tested in Unit 8 following the inmate's positive test. This decision is consistent with the advice of the State of Nevada Medical Director, Dr. Azzam, as he has informed the NDOC that individuals who may have been exposed to someone with COVID–19 only need to be tested if they show symptoms consistent with COVID–19.[48] To this end, NDOC confirms that any inmate housed in Unit 8 that was (or may be) experiencing COVID–19 symptoms was (and will be) tested.[49]  As of the date of this filing, a minimum of at least three inmates have been tested since the positive test of July 11, 2020. These tests occurred between July 20

---

[40] *Id*. at 2, ¶ 6.

[41] *Id*. at 2, ¶¶ 6–7.

[42] *Id*.

[43] *Id*.

[44] ECF No. 12–1 at 12, ¶¶ 10–11.

[45] *Id*. at 12, ¶ 11.

[46] *Id*.; *see also* Decl. of Associate Warden James Scally at 5, ¶ 18, attached as **Exhibit 4.**

[47] **Ex. 4 at 5–6, ¶ 18**.

[48] **Ex. 2 at 2, ¶ 8**.

[49] *Id*.

and July 22, 2020,[50] and included two of Williams' witnesses, inmates Young[51] and Richardson.[52] All three tests were negative for COVID–19 infection.[53]

Accordingly, as explained to Williams in emergency grievance responses of July 15 and July 17, 2020, inmates in Unit 8 will be tested based on approvals and medical determinations made by the NDOC medical staff.[54]

### 4.    Phones and Other Items Are Cleaned and Sanitized

Williams next relies on declarations from himself as well as fellow inmates to allege that the phone and other items such as handcuffs, trays, inside Unit 8 are not disinfected.[55] Despite these claims, NDOC confirms that all items are routinely and regularly cleaned and sanitized—although given that each of these items are portable (including the phone), it is certainly possible that Williams and fellow inmates were not aware of how and when these items are sanitized.[56]

SDCC's cleaning methods and procedures have previously been provided to this Court in both this case as well as the Kerkorian case, and therefore will not be rehashed here.[57] Instead, NDOC simply confirms those cleaning and sanitization procedure remain in place as confirmed by Associate Warden Scally.[58]

Further, as this Court has previously been made aware, and as Williams knows, cleaning supplies are made available to each inmate upon request. This was reiterated to

---

[50] *Id.*

[51] ECF No. 47 at 19.

[52] *Id.* at 16.

[53] **Ex. 2 at 2–3, ¶ 8**.

[54] ECF No. 47 at 8–9.

[55] *See* ECF No. 47 at 6 at ¶ 6, 14 at ¶ 3, 16, 18–19, ¶ 6; *see also id.* at 11 at ¶ 3.

[56] **Ex. 4 at 4, ¶ 13**.

[57] *See* ECF No. 6 at 11:18–13:2; ECF No. 6–7 at 3–4, ¶¶ 6–9; ECF No. 9 at 5:1–6:13; *see also* **Ex. 3**, *Kerkorian*, ECF No. 18 at 18:5–6; *Kerkorian*, ECF No. 18–6 at 4–6, ¶¶ 13–19, attached as **Exhibit 5**. Please note that one attachment from ECF No. 18–6 has been removed as it was a duplicate of the same Operational Procedure 490. The correct attached, OP 211B, however is part of the record in this case, as it was filed as ECF No. 9–5.

[58] **Ex. 4 at 2–4, ¶¶ 4–11**.

him on July 17, 2020 when in response to his July 17, 2020 Emergency Grievance he was reminded that he is "given cleaning supplies to keep [his] cell clean."[59]

### 5.    Williams Confirmed the Use of Masks By Staff

In addition to the information NDOC has previously provided to this Court regarding the use of mask and reiterated above, Williams has confirmed at least in part that staff wear PPE as he claims that all "staff are <u>now</u> wearing N95 masks."[60]

### 6.    Williams' Unit Was Appropriately Quarantined

Williams alleges Unit 8 was not quarantined following the positive test of the inmate. He based this assertion by claiming that new inmates were moved into the unit following the positive COVID-19 test.[61] Despite this assertion, following the July 11, 2020 positive test, all Unit 8 inmates were quarantined for a minimum of fourteen (14) days as per NDOC protocol.[62] While there may have been inmates transferred *into* Unit 8 during that timeframe, those transfers only occurred after the positive inmate was transferred to the infirmary (Unit 9) and placed in a negative airflow cell on July 11, 2020.[63]

### 7.    NDOC Continually Updates Inmates About COVID–19

Finally, while one of Williams' witnesses claims he was not aware of the existence of COVID–19—and voluntarily put himself at risk by not wearing a mask provided to him[64]—inmates have routinely been kept up to date through the use of Town Hall Meetings held two times per week at SDCC.[65]  As Associate Warden Scally avers, inmates are routinely informed of the status of COVID–19. In addition, the NDOC has provided numerous press

---

[59] ECF No. 47 at 9.

[60] *Id.*

[61] *See id.* at 11 at ¶ 6, 14 at ¶ 5, 19 at ¶ 7.

[62] **Ex. 4 at 5, ¶ 17**; *see also* ECF No. 47 at 14 at ¶ 5, 19 at ¶ 7.

[63] **Ex. 4 at 5, ¶ 18; Ex. 2 at 2, ¶ 7**.

[64] ECF No. 47 at 18 at ¶ 4.

[65] **Ex. 5**, *Kerkorian*, ECF No. 18–6 at 8 at ¶ 27.

releases regarding COVID–19 procedures as well as the numbers of inmates and staff who have tested positive.[66]

## III.   LEGAL STANDARD REGARDING INJUNCTIVE RELIEF

Injunctive relief, whether temporary or permanent, is an "extraordinary remedy, never awarded as of right."[67]  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[68]

Furthermore, under the Prison Litigation Reform Act ("PLRA"), preliminary injunctive relief must be "narrowly drawn," must "extend no further than necessary to correct the harm," and must be "the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2). The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.* "[T]here must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint."[69]

## IV.   WILLIAMS FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES

As a preliminary matter, before addressing why each of *Winter* factors weigh against issuing an injunction, NDOC notes that Williams' failure to seek administrative relief under the PLRA calls into question whether Williams has properly exhausted his administrative remedies.  And this is true even though COVID–19 certainly involves a rapidly changing legal and medical circumstance, as at least two Circuits have noted the need to address PLRA exhaustion requirements in the context of COVID–19.

---

[66] *See e.g.*, Press Releases of July 17, 2020 and June 24, 2020, which are publicly available at http://doc.nv.gov/About/Press_Release/News/, last accessed July 29, 2020. Copies of these press releases are attached as **Exhibit 6**.

[67] *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 24 (2008).

[68] *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

[69] *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 635–36 (9th Cir. 2015).

In *Swain v. Junior*,[70] the court noted in dicta that "the district court likely erred in declining to address PLRA exhaustion at the preliminary injunction stage."[71] In addition to referencing *Ross v. Blake*,[72] the Eleventh Circuit noted the district court's decision to not address the exhaustion issue "at the preliminary injunction stage . . . was misguided."[73]  In the reasoning of the Circuit, the district court could not conduct an appropriate inquiry into whether the plaintiffs were likely to succeed on the merits of "their § 1983 claim, without, at the very least, finding that the defendants were unlikely to carry their burden of establishing failure to exhaust."[74]

Similarly, in *Valentine v. Collier*,[75] the Fifth Circuit noted the plaintiffs "face[d] several obstacles to relief under the" PLRA, including "exhaustion and narrowness."[76] *Valentine* then confirmed that the three *Ross* factors[77] are the only situations in which administrative remedies are not available.[78] It then announced that under those standards, the plaintiffs' "suit appears premature."[79] *Valentine* reached this conclusion even though the district court "considered the [grievance] process too lengthy to provide timely relief, and therefore incapable of use and unavailable under the special circumstances of the COVID–19 crisis."[80] As the appeals court noted, the district court holding in that regard

---

[70] 958 F.3d 1081 (11th Cir. 2020).

[71] *Id*. at 1091–92.

[72] 136 S. Ct. 1850, 1856 (2016).

[73] *Swain*, 958 F.3d. at 1092.

[74] *Id*. (citing *Gonzales v. O Centro Espirita Benficente Unioa do Vegatal*, 546 U.S. 418, 428–29 (2006).

[75] 956 F.3d 797 (2020).

[76] *Id*. at 804.

[77] These factors are when (1) the procedure is a "dead end" because the officials do not have the requisite authority to provide relief, (2) the grievance procedure scheme is too opaque for an inmate to use, or (3) when prison officials "tak[e] advantage of a grievance process through machination, misrepresentation, or intimidation." *Valentine*, 956 F.3d at 804 (citing *Ross*,136 S. Ct. at 1859–60).

[78] *Valentine*, 956 F.3d at 804.

[79] *Id*.

[80] *Id*. at 804–05.

1    was error as it attempted to revive "the rejected portions of the old [special circumstances]

2    regime" rejected in *Ross*.[81]

3        Justice Alito has also implied that administrative remedies must also be completed

4    by inmates despite the COVID–19 crisis.[82] Justice Alito's statement in this regard occurred

5    when the Court denied the request to vacate a COVID–19 injunction stayed by the Fifth

6    Circuit, where, like *Valentine*, the court noted the district court's PLRA exhaustion analysis

7    ran "counter to Supreme Court precedent."[83]

8        As such, the NDOC respectfully requests that the instant Motions be denied due to

9    Williams' failure to exhaust his administrative remedies.

10   **V.    NO INJUNCTION SHOULD ISSUE**

11       Regardless of the valid exhaustion concern, Williams is not entitled to injunctive

12   relief as none of the *Winter* facts weigh in his favor: (1) he is not likely to win on the merits;

13   (2) he cannot establish irreparable harm in the absence of this preliminary injunction; (3)

14   he cannot establish that the balance of the equities tip in his favor; and (4) he cannot

15   establish that any injunction is in the public interest.

16   **A.    Williams Is Not Likely To Succeed on the Merits**

17       While Williams does not provide any specific objections to the current protocols and

18   in procedures NDOC has put in place to protect him and all inmates from COVID–19, it

19   appears as if he seeks to have this Court implement new or different procedures (without

20   stating what those procedures should be). Given that Nevada is at the forefront of the world

21   in responding to COVID–19, he is not likely to succeed on the merits.

22       To establish an Eighth Amendment constitutional violation for allegedly failing to

23   prevent harm, Williams must establish that the alleged deprivations, e.g., failure to take

24   steps to prevent COVID-19 at SDCC, are from an objective standpoint, "sufficient serious."

25       [81] *Id*. at 805.

26       [82] *Marlowe v. LeBlanc*, ___ S. Ct. ___, 2020 WL 2780803 at * 1 (May 29, 2020)
     ("Nothing in this order should be construed to preclude applicant [the inmate] *from filing*
27   *a grievance* setting out specifically the relief he requests be provided to him in the prison,
     and in the event that such request is filed, it should be decided promptly") (emphasis
28   added).

         [83] *Marlowe*, 2020 WL 2043425 at * 3.

For establish this objective prong, Williams is required to show that NDOC generally, and staff at SDCC specifically have "incarcerated [him] under conditions posing substantial risk of serious harm," and that "the official . . . acted with a 'sufficiently culpable state of mind.'" *Famer v. Brennan*, 511 U.S. 825, 834 (1994). While not directly a medical indifference case, the claims are best analyzed under that lense as he challenges the NDOC's implementation of, and compliance with, medical policies and procedures put in place to protect him and others from the spread of COVID–19.

In that regard, deliberate indifference is a high legal standard; a medical professional's mistake, negligence, or malpractice is not sufficient to constitute deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). An inmate alleging deliberate indifference to serious medical need "must allege acts or omissions sufficiently harmful" to the inmate. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Prison officials do not violate the Eighth Amendment even in situations where harm may befell an inmate so long as the officials "responded reasonably to the risk." *Farmer*, 511 U.S. at 844.

Here, NDOC concedes that while COVID-19 is a serious medical condition, there is no evidence Williams has COVID–19, as he has tested negative for the illness. Thus, the question is not whether COVID–19 is a serious medical condition, but rather whether NDOC has taken medically reasonable steps to help prevent Williams and all other inmates from getting COVID–19. Since the NDOC protocols have resulted in one of the lowest infections rates in the world, and objectively put inmates within the NDOC system in a safer position than any United States or Nevada resident, Williams cannot succeed on the merits of his claim.

### 1.    NDOC's COVID–19 Protocols and Procedures

As this Court is fully aware from Williams previous motion as well as the pending Kerkorian matter, NDOC has implemented stringent screening procedures the individuals permitted to enter its institutions. These procedures include visual and temperature checks upon entry, prohibiting entry to anyone who is showing symptoms of potential COVID-19, taken measures to sanitize common areas numerous times a day, and ensuring that

officers, vendors, and inmates are quarantined, denied access, or isolated and observed away from other inmates when there is any question about the individual's COVID–19 status. Or, in the words of Director Daniels on April 27, 2020, "when in doubt, keep them out."[84]

In addition, the NDOC protocols and procedures are substantially similar to those the CDC published as interim guidance on March 23, 2020.[85] A review of the CDC guidance makes clear the NDOC has used the same definition of someone who is considered to be in "close contact" with a COVID-19 patient[86] and relies on the same symptoms of fever, cough, and shortness of breath.[87] Dr. Minev not only includes these three symptoms, but on April 29, 2020 added "chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell."[88] Dr. Minev further lowered the temperature threshold to 100 degrees on May 8, 2020.[89]

The CDC also notes the importance of hygiene, restricting travel and access, cleaning "several times per day," performing visual inspection and temperature checks for all individuals prior to entry into the institution, and ensuring that employees and other outside individuals are not permitted access after showing symptoms "for at least 72 hours" and that 14 days self-quarantines should be instituted.[90]

---

[84] NDOC Memorandum from Director Daniels, dated April 27, 2020, attached as **Exhibit 7**.

[85] *See Interim Guidance on Management of Coronavirus Disease (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#prevention last accessed June 8, 2020. This Court has been provided a copy of this guidance in both this case, ECF No. 6–14 and ECF No. 6–15, and the Kerkorian case, *Kerkorian*, ECF No. 15–4.

[86] *Compare* ECF No. 6–14 at 3–4, ECF No. 6–2 at 3, ¶ 5, ECF No. 6–13 at 2–3.

[87] *Compare* ECF No. 6–14 at 4–5, ECF No. 6–1 at 4, ECF No. 6–10 at 2, ECF No. 6–13 at 2–3.

[88] Email of April 29, 2020, previously provided at *Kerkorian*, ECF No. 18–5 at 41 (and authenticated at ECF No. 18–5 at 7, 15), and attached as **Exhibit 8**.

[89] Email of May 8, 2020, previously provided at *Kerkorian*, ECF No. 18–5 at 39 (and authenticated at ECF No. 18–5 at 7, ¶ 15), and attached as **Exhibit 8**.

[90] *See generally* ECF No. 6–14 and ECF No. 6–15.

Dr. Minev has reiterated these CDC procedures are closely followed by him and NDOC staff in implementing the ever-changing protocols and procedures putting NDOC in the best possible position to protect inmates and staff from COVID–19.  This includes the requirement of having any correctional officer who has tested positive to not return for work until there have been two negative tests separated in time by a 48 hours, a fourteen day quarantine, *and* being symptom free for at least 72 hours – which requires the quarantine to be longer than 14 days if the officer is showing symptoms on that 12th, 13th, or 14th day of the quarantine.[91]

Just as Warden Howell previously confirmed the steps SDCC has taken to ensure proper hygiene and cleaning, and confirmed that the SDCC has implemented Dr. Minev's protocols as noted above, Associate Warden Scally has confirmed that SDCC continues to comply with these stringent sanitization and medical protocols.[92]

### 2.    Substantial Compliance with CDC Guidelines Precludes Injunctive Relief

The NDOC's substantial compliance with CDC Guidelines precludes Williams from obtaining in TRO or preliminary injunctive relief in this case. This was made clear by the Ninth Circuit in *Roman v. Wolf*.[93] Specifically, there, the Ninth Circuit stayed the following aspects of the preliminary injunction issued by the Central District of California:

- a mandate that all staff maintain six foot social distancing from each other and detainees;[94]

- a mandate that detainees maintain six foot social distancing whenever possible;[95]

- a requirement that all common areas and shared items "be cleaned and disinfected by a professionally trained cleaning staff;"[96]

---

[91] Kerkorian, ECF No. 18–5 at 6, ¶ 15(e), attached as **Exhibit 8**.

[92] **Ex. 4 at 3–4, ¶¶ 9, 12**.

[93] 2020 WL 2188048 (9th Cir., May 5, 2020).

[94] *See Roman v. Wolf*, Pre. Inj., ECF No. 55 at 3, ¶ 14, attached as **Exhibit 10**.

[95] *Id.* at 3, ¶ 15.

[96] *Id.* at 4, ¶ 17.

- • a requirement to provide detainees with training, cleaning equipment and supplies so "the detainee can clean and disinfect . . . on a regular basis, but at least once a day;"[97]

- • **requiring all staff to "wear mask and gloves . . . at all times while on duty"**[98]

- • requiring detainees to wear masks and be provided gloves;[99]

- • **requiring detainees to be provides with soap, hand soap or hand sanitizer in "sufficient quantities . . . that the detainees never run out of supplies;"**[100]

- • **requiring the facility to inform the court of its new cleaning procedures and schedule as well as an operations plan implementing the requirements of the injunction;**[101] and

- • **requiring weekly updates be provided to the court**.[102]

Instead, the only portion of the preliminary injunction the Ninth Circuit permitted to remain in place was the portion of the injunction that ordered the defendants to substantially comply with the CDC interim guidance report.[103]  However, even if this portion of the ruling was not unanimous.

Writing in partial concurrence, one judge noted the interim report cannot be adopted in full by all institutions, as it states "in boldface type on the very first page, that '**[t]he guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions**.'"[104] The interim report also states that it "will not necessarily address *every possible custodial*

---

[97] *Id* at 4, ¶ 18.

[98] *Id*. at 4, ¶ 20.

[99] *Id*. at 4, ¶¶ 21–22.

[100] *Id*. at 5, ¶¶ 23–24.

[101] *Id*. at 5, ¶ 26(B)–(C).

[102] *Id*. at 6, ¶ 28.

[103] *Id*. at * 1.

[104] *Roman*, *supra* (Collins, J., *concurring in part and dissenting in part*); *see also* ECF No. 6–14 at 2.

1   *setting,*"[105] and provides, again in boldface font, that "**[a]dministrators and agencies**

2   **should adopt these guiding principles to the *specific needs of their facility*.**"[106, 107]

3       Regardless, unlike in *Roman*, where a review of the underlying findings and

4   conclusions do not establish any compliance with the standards—and also show conditions

5   of confinement drastically different (and not for the better) than those Williams and all

6   NDOC inmates experience,[108] here NDOC is substantially complying with CDC guidance.

7   Because any injunctive relief Williams may be seeking—or that this Court could

8   theoretically order—would necessary be similar to those listed above that were stayed by

9   the Ninth Circuit, and already being done by NDOC, *Roman* necessitates denial of

10  Williams' attempt to have this Court micromanage the NDOC's COVID–19 response.

11      **3.    The District Court of Oregon Has Denied Similar Relief**

12      The District of Oregon's recently denied a COVID–19 related preliminary injunction

13  in *Maney v. Brown*.[109] There, one 52 year old inmate who testified on behalf of the plaintiffs

14  noted he "suffer[ed] from heart disease [requiring] a pacemaker and implanted

15  defibrillator" along with "30 trips to the hospital since 2016."[110] He also noted he was

16  "housed in a dorm–style facility with 80 other medically vulnerable individuals where he

17  sleeps three feet away from others."[111]

18      Despite these undisputed facts, and the possibility the ODOC may not have

19  "responded perfectly 'to the COVID–19 pandemic" or done all it could "to keep [inmates]

20  safe,"[112] the court concluded that the plaintiff had not established that the "ODOC ha[d]

---

[105] ECF No. 6–14 at 2 (emphasis added).

[106] *Id*. at 3 (bold in original; italics added).

[107] The CDC interim guidance for correctional facilities was updated on July 22, 2020. The revised version is substantially similar to the previous version, and still notes that adjustments must be made based on the needs of the facilities. The updated version is attached as **Exhibit 9**.

[108] *See generally*, *Roman v. Wolf*, 2020 WL 1952656 (C.D. Cal., April 23, 2020).

[109] ___ F.3d ____; 2020 WL 2839423 (D. Or., June 1, 2020).

[110] *Id*. at * 1.

[111] *Id*. at * 1.

[112] *Id*.

acted with *deliberate indifference* toward the health risks that COVID–19 poses to those currently in custody."[113] In rejecting the plaintiff's assertions, the court noted ODOC implemented "procedures to fight the spread of COVID–19," including social distancing measures, the purchase of masks for staff and inmates, medical education, prohibitions on visitation, additional cleaning supplies, quarantine procedures, and the use of "negative pressure rooms, and, if necessary local hospitals," for those inmates who test positive.[114] The plaintiffs proffered over fifty declarations that addressed "the current conditions in ODOC's facilities," and many of them noted the difficulties or impossibility of social distancing and inadequate treatment and testing.[115] Yet, in denying injunctive relief, the court noted the plaintiffs could not cite "to any evidence to establish that Defendants 'subjectively believed the measures they were taking were inadequate.'"[116] And while the NDOC has tested *every inmate and staff member*, and is in the process of testing all inmates and staff member again,[117] *Maney* held it was not deliberately indifferent to not test asymptomatic individuals.[118]

*Maney* also noted the significant federalism and separation of power concerns implicated by "[a]ny injunctive relief [the court] could order," particularly when "'running and overseeing prisons is traditionally the province of the executive and legislative branches'" due to "'courts [being] "ill equipped" to undertake the task of prison administration.'"[119]  Based on these constitutional and pragmatic concerns, *Maney* noted the importance of providing respect to "correctional experts with many years of experience in in–depth knowledge, and [that] court involvement *runs the risk of disrupting ODOC's*

---

[113] *Id.*

[114] *Id.* at * 3.

[115] *Id.* at * 5–6.

[116] *Id.* at * 15 (citing *Swain*, 958 F.3d at 1089).

[117] **Ex. 2 at 3–4, ¶¶ 12–16**.

[118] *Maney* , 2020 WL 2839423 at * 16 (citing *Wragg v. Ortiz*, ___ F. Supp.3d ___, 2020 WL 2745247, at * 21 (D. N.J. 2020)

[119] *Id.* at * 19 (quoting *Money v. Pritzker*, ___ F. Supp. 3d ___, 2020 WL 1820660, at * 16–19 (N.D. Ill. 2020) and *Valentine*, 2020 WL 1916883, at * 14).

*currently COVID–19 response*."[120] Based on these factors, the court concluded "preliminary injunctive relief [was] not warranted."[121]

Just as in *Maney*, federalism and separation of power concerns require this court to deny unclear and non-developed relief sought by Williams.

### 4.    The Northern District of California Followed *Maney*'s Lead

On June 25, 2020, in the case of *Gonzalez v. Ahern*, the Northern District of California also rejected a TRO brought by fourteen (14) inmates alleging that the defendants were failing "to provide reasonable COVID–19 prevention, care, and treatment."[122] The plaintiffs' claim was rejected as they "failed to demonstrate a likelihood of success on their claim that [the defendants were] deliberately indifferent to the risks of exposure of COVID–19 . . . or deliberately indifferent with respect to the medical care provided to those with COVID–19."[123]

There, the plaintiffs sought a TRO requiring the defendants to:

> (1)    require appropriate use of PPE by all deputies and staff,
>
> (2)    provide real supplies and tools required for actual cell sanitation;
>
> (3)    perform genuine and consistent housing sanitation including sanitation of tablets, **phones**, tables and the like;
>
> (4)    provide consistent supplies of soap, masks, and sanitation wipes for prisoners;
>
> (5)    offer actual medical care and comfort for those who are infected with COVID–19, including palliative care; and
>
> (6)    provide accurate and prompt information to prisoners on their own medical condition and incidence and source of COVID–19 cases at the Jail.[124]

---

[120] *Id*. at * 19 (citations omitted; emphasis added).

[121] *Id*. at * 20 (citing *Winter*, 555 U.S. at 20; *Valentine*, 956 F.3d at 802; *Swain*, 958 F.3d at 1090).

[122] *Gonzalez v. Ahern*, 2020 WL 3470089 (N.D. Cal. June 25, 2020).

[123] *Id*. at * 1.

[124] *Id*. at * 3.

After concluding that the defendants did not meet their burden to have the TRO injunction dismissed due to lack of exhaustion,[125] the court turned to the *Winter* factors and first concluded that the plaintiffs were not likely to succeed on the merits. Tellingly, there, the plaintiffs argued that while the defendants had "offered declarations of written policies and procedures, [those] written policies fail[ed] to reflect the on–the–ground practices."[126] In support of this argument, the plaintiffs provided the court with fifteen (15) declarations attesting to a "continuing and on-going issue[] with the sanitation supplies they are provided including that they are often not provided with sufficient cleaning solution or mops, . . . tablets are not cleaned between users, the soap is unusable for personal hygiene, and the showers are unclean."[127]  There was also an allegation that at least one inmate was not tested for COVID–19 nor screened by way of a temperature check despite being "placed in an unclean holding cell with several individuals."[128]

Despite these allegations, the court held the plaintiffs were not likely to succeed on the merits of their claims.  In reaching this conclusion, the court cited with approval *Maney*, noting "the question is not whether [defendant] can do better, the question is whether [defendant] has acted with indifference to the risks posed by COVID–19."[129]  The court also noted that the defendants' "response to the pandemic has been effective at reducing COVID–19 within the Jail population [as] borne out by the numbers."[130] There, the jail had fifty-eight (58) positive tests, although fifty had fully recovered and eight had been released.[131] Given that the court found it unlikely that the plaintiffs could succeed on the

---

[125] *Id*. at * 3–4.

[126] *Id*. at * 5.

[127] *Id*. (These allegations are similar to Williams' assertions that despite NDOC's stated policy of providing sufficient cleaning supplies and ensuring timely sanitization, SDCC is not ensuring that showers are cleaned or that phones and trays are not disinfected between uses).

[128] *Id*. (These allegations are similar to Williams' claim that individuals were moved into Unit 8 following the positive test even though the unit was on quarantine, as well as Williams' allegation that the inmate's cell was not cleaned).

[129] *Id*. at * 6 (citing *Maney*, *supra* at * 3).

[130] *Id*.

[131] *Id*.

merits despite a total of fifty–eight (58) positive COVID–19 tests among inmates, it is absurd to conclude that Williams would be likely to succeed on the merits of his case given that there has only been ONE inmate at SDCC that has tested positive, it is undisputed that the inmate was removed from the unit and medically isolated, and that NDOC as a whole has only had a total of twenty–two (22) inmates test positive.

Therefore, while NDOC wishes there were zero inmate and staff who have tested positive, based on the numbers, Williams suggests that any short of a 100% negative rate means NDOC is acting in a deliberately indifferent manner. That is simply untrue. Rather, NDOC is going above and beyond to manage the COVID–19 pandemic in a deliberately careful and concerned manner.

### 5.   The Eleventh Circuit Has Also Rejected A Similar Injunction

In *Swain v. Junior*,[132]–a case relied by the *Maney* court—the Eleventh Circuit reversed the district court's grant of injunctive relief as it concluded the government officials—not the inmate—were "likely to succeed" on the merits given the plaintiff "offered little evidence to suggest that the defendants were deliberately indifferent."[133] In reaching this conclusion, *Swain* noted, among other things, that the prison's inability to "'achieve meaningful social distancing'" did not rise to the level of deliberate indifference even when the social distancing policies that were put in place were "'not uniformly enforced.'"[134]

What was important in *Swain* was that the prison had "adopted extensive safety measures such as increased screening, providing protective equipment, adopting social distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures."[135]   Each of these things have been instituted by the NDOC. And while Williams attempts to cast aspersions due to his belief there may be some discrepancy in the enforcement of these policies, there simply is *no evidence* that NDOC is not taking

---

[132] 958 F.3d 1081 (11th Cir. 2020).

[133] *Id.* at 1089.

[134] *Id.*

[135] *Id.*

COVID–19 precautions sufficiently serious or that anyone employed by the NDOC is deliberately acting in an indifferent manner regarding those protections.

Accordingly, to the extent Williams wishes to have this Court issue an injunction requiring NDOC to "follow its own laws and procedures . . . [t]he Supreme Court [has] held that the Eleventh Amendment prohibits federal courts from enjoining state facilities to follow state law."[136] Based on that admonition, even if this Court were to fashion injunctive relief similar to what the NDOC has implemented in an effort to "'promote compliance'" with its own policies, such an injunction would do what "*Pennhurst* plainly prohibits."[137]

## B. Williams Cannot Establish Irreparable Harm

Williams has not established irreparable harm. At best, Williams has set forth a possible future harm. Such speculative future harm "does not meet the standard of showing 'likely' irreparable harm."[138] This is especially true given that Williams is 75% more likely to contract COVID–19 outside the walls of SDCC than he is within SDCC. As in *Gonzalez*, these numbers confirm that the NDOC's COVID–19 response is putting Williams and all other NDOC inmates in the best possible position to avoid contracting COVID–19.

The evidence also establishes that NDOC is not resting on its laurels. On July 26, 2020, the NDOC initiated another round of testing for all inmates at every facility. The NDOC has also committed to testing all staff members once every two weeks to further combat the possibility of a staff member infecting inmates.[139] Given the reliance on the CDC protocols, and the undisputed fact that NDOC is taking steps to test *everyone*

---

[136] *Valentine*, 956 F.3d at 802 (quoting *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 103–23 (1984)).

[137] 956 F.3d at 802.

[138] *Switch, Ltd. v. Firespotter Labs*, Case No. 2:14cv–1727–JAD–NJK, 2014 WL 2586723, at * 2 (D. Nev., Oct. 24, 2014) (citing *Herb Reed Enterprises, LLC v. Florida Entertainment Mgmt., Inc.*, 736 F.3d 1239, 1250–51 (9th Cir. 2013); *see also Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a *possibility of irreparable harm* is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief").

[139] **Ex. 2 at 3–4, ¶¶ 12–16.**

*regardless of any exposure of symptoms*, Williams cannot establish either that NDOC has objectively placed him at harm or that it is subjectively aware of any harm.

As opposed to Williams, the NDOC would face irreparable injury if a TRO or injunction is granted. This is because this Court would be taking "charge of many administrative decisions typically left to [NDOC and other state] officials."[140] And, respectfully, this Court's intervention by way of an injunction, would inevitably tie NDOC's hands and limit NDOC's ability to make the rapid revisions that may be necessary to continue to combat this pandemic. Given the NDOC's success rate in protecting prisoners up, this is risk that should not be taken as it could conceivably derail one of the most highly successful COVID–19 prevention protocols implemented in any correctional setting in the United States.

### C.  The Equities Do Not Tip In Williams's Favor

The NDOC has shown that it is constantly reviewing and revising its COVID–19 protocols in an effort to stay ahead of the rapidly changing conditions faced globally. This includes reliance on CDC and other governmental health guidance that changes on a daily—if not hourly—basis.  It would be difficult, if not impossible, for this Court to fashion injunctive relief in an order that would not, in some way, tie the hands of NDOC, which in turn could prevent it from taking swift and decisive action to changing conditions. The implementation of an injunction here would preclude the NDOC from taking the swift action needed to stay ahead of this pandemic. This is the type of micromanagement that the PLRA injunction limitations is designed to avoid.[141] Or, as stated in *Swain*, if this Court were to issue an injunction in this case it would be "assume[ing] the role of 'super-warden.'"[142]

### D.  The Public Interest Weighs Against Granting the Injunction

Finally, the public interest weighs against granting the injunction. The NDOC has taken aggressive action, implemented progressive and proactive protocols, and exhibited

---

[140] *Swain*, 958 F.3d at 1090.

[141] *See generally Gilmore v. California*, 220 F.3d 987, 999 n. 14 (9th Cir. 2000).

[142] *Swain*, 958 F.3d at 1090.

the ability to make changes and updates to its procedures and practices to ensure that it is doing its level–best to keep COVID-19 from spreading throughout its institutions. Because NDOC is taking its cue from the CDC and other governmental health organizations, and has, thus far, successfully battled back this disease, the public interest does not weigh in favor of granting the injunction. This is especially true when taking into account the requirement that in the PLRA context, any injunctive relief must be "narrowly tailored" to correct the harm. Here, no harm has been or can be shown.

To this end, *Swain*, noted the appropriate "question is not whether COVID–19 presents a danger to the inmates. . . .The question is instead whether the plaintiffs have shown that they will suffer irreparable injuries that they would not otherwise suffer in the absence of an injunction."[143] Here, the answer to that question, as it was in *Swain*, is that "[n]othing in the record indicates that the defendants will abandon the current safety measures absent a preliminary injunction, especially since the defendants implemented many of those measures before the plaintiffs even filed the complaint."[144]

## VI.    CONCLUSION

Williams has not and cannot establish any of the four necessary elements to obtain an injunction. Perhaps most important, Williams cannot show any irreparable has come to him or any other inmate based on NDOC's current clinical procedures and practices. In addition, Williams cannot establish how any speculative proposed injunctive relief would prevent him or other inmates from suffering irreparable harm in the future. Indeed, respectfully, given the current state of the pandemic outside the prison walls, all current evidence suggests that the NDOC's actions to combat this pandemic is working to keep Williams and all of its inmates as safe as possible during these difficult days.  In short, Williams is far safer with NDOC custody than he would be if he was simple a United States or Nevada resident.

/././

---

[143] *Id*. at 1090–91.
[144] *Id*. at 1091.

Williams' motion for injunction relief and show cause must be denied.

Respectfully submitted on this this 29th day of July, 2020 by:

AARON D. FORD
Attorney General

By: /s/ *D. Randall Gilmer*
D. Randall Gilmer (Bar No. 14001)
Chief Deputy Attorney General
*Specially Appearing as Attorneys for*
*Warden Howell and NDOC*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing **SPECIALLY APPEARING DEFENDANTS' RESPONSE AND OPPOSIITON TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER (ECF NO. 46) AND MOTION FOR ORDER TO SHOW CAUSE (ECF NO. 47) AS DIRECTED BY THIS COURT ON JULY 24, 2020 (ECF NO. 48)** with the Clerk of the Court by using the electronic filing system on the 29th day of July, 2020.

I certify that some of the participants in the case are not registered electronic filing system users.  In the instant case, the Court will serve on Southern Desert Correctional Center via electronic service to the facility to the following:

Marcell Williams, #1120655
Southern Desert Correctional Center
P.O. Box 208
Indian Springs, NV 89070

 /s/ Natasha D. Petty
An employee of the Office of the Attorney General

**INDEX OF EXHIBITS**

EXHIBIT 1 — Wall Street Journal Article

EXHIBIT 2 — Declaration of Miguel Forero

EXHIBIT 3 — *Kerkorian*, ECF No. 18

EXHIBIT 4 — Declaration of Associate Warden James Scally

EXHIBIT 5 — *Kerkorian*, ECF No. 18–6

EXHIBIT 6 — NDOC Press Releases of June 24 and July 17, 2020

EXHIBIT 7 — April 27, 2020 Memorandum from Director Daniels

EXHIBIT 8 — *Kerkorian*, ECF No. 18–5

EXHIBIT 9 — Updated CDC Interim Guidance Handout re: COVID-19

EXHIBIT 10 — *Roman v. Wolf*, Pre. Inj., ECF No. 55