# EXHIBIT 3 – Defendants' Response in Opposition to Plaintiff's Motion for Preliminary Injunction filed in Kerkorian v. State of Nevada, 2:20-cv-00950

AARON D. FORD
Attorney General
D. Randall Gilmer (Bar No. 14001)
Chief Deputy Attorney General
Office of the Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, Nevada 89101
Telephone: (702) 486-3427
Facsimile: (702) 486-3773
Email: drgilmer@ag.nv.gov
*Attorneys for Specially Appearing Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

GREGORY KERKORIAN, an individual,

Plaintiff,

v.

STATE OF NEVADA DEPARTMENT OF
CORRECTIONS (NDOC) *et al.*

Defendants.

Case No. 2:20-cv-00950

**DEFENDANTS' RESPONSE IN
OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION**

Defendants, by and through counsel, Aaron D. Ford, Attorney General for the State of Nevada, and D. Randall Gilmer, Chief Deputy Attorney General, specially appearing as this Court has ordered,[1] hereby provide this Response in Opposition to *Plaintiff's Motion for Preliminary Injunction*[2] (Motion).

## I.    INTRODUCTION

Kerkorian first sought injunctive relief before the Nevada Supreme Court regarding these same issues over *two months* ago.[3] That similar claim for broad injunctive relief was unanimously rejected over one month ago.[4] In rejecting that claim, the Nevada Supreme Court suggested Kerkorian seek "appropriate relief before a district court, the Nevada Parole Board, or the Nevada Pardons Board."[5]

---

[1] ECF No. 14.
[2] ECF No. 16–1. The corrected copy still fails to comply with LR 7–3(b) and no motion to extend the page limit was filed. *See* LR 7–3(c). It also contains different text despite Plaintiff's emails to counsel and this Court noting that it did not "eliminate any sections" and that "[n]othing of substance has been altered between the two documents." See Emails attached as **Exhibit I**.
[3] *See* Nevada Supreme Court Docket, attached as **Exhibit A**.
[4] **Exhibit B,** *Kerkorian v. State of Nevada et al.*, Case No. 80917, issued April 30, 2020.
[5] *Id.* at 6.

Instead of following the Nevada Supreme Court's advice by seeking additional state remedies, Kerkorian did nothing more for a month. This is perplexing, as Kerkorian's attorneys initially "plan[ned] to ask a judge in Nye County, where [he] was originally charged, to modify his sentence."[6] Now, a month later, he seeks this Court's intervention in another attempt to obtain unnecessary injunctive relief.  His delay in collaterally seeking another bite at the injunctive apple calls into question his alleged harm.

On April 16, 2020, this Court heard testimony regarding the protections and protocols put in place by the Nevada Department of Corrections (NDOC) generally and at Southern Desert Correctional Center (SDCC) specifically.[7] This Court concluded in that case that injunctive relief was not warranted based on the steps undertaken by the NDOC and SDCC.[8]  This Court has also been provided sixteen (16) updates relating to COVID-19 positive tests and informing the Court as to what additional steps NDOC has taken to contain the spread following each positive diagnosis.[9]

In addition, at least two Circuit Courts, the Fifth in two cases,[10] and the Eleventh in one case,[11] have specifically rejected district court injunctions seeking relief substantially similar to what Kerkorian seeks. At least one federal district court from this Circuit has denied injunctive seeking injunctive relief similar to that involved in the instant case.[12] And the Ninth Circuit also significantly curtailed injunctive relief it concluded went too far afield.[13] These holdings are merely a sample of the multitude of cases

---

[6] *Nevada Supreme Court denies petition to free prisoners in pandemic*, Las Vegas Review–Journal, May 1, 2020, https://www.reviewjournal.com/crime/courts/nevada-supreme-court-denies-petition-to-free-prisoners-in-pandemic-2019491/, last accessed June 10, 2020, attached hereto as **Exhibit C**. The Nevada Supreme Court also notified Nye County of its decision. **Ex. B at 6**.

[7] *See Williams*, Case No. 2:20cv–00639–RFB–BNW, ECF No. 13.

[8] *Williams*, ECF No. 14.

[9] *See Williams,* ECF Nos. 16–27, 30–33.  These documents were filed under seal as permitted. While counsel would generally provide these documents to opposing counsel as a matter of professional courtesy, due to Kerkorian's counsel intentionally providing this Court and the Nevada Supreme Court with an unredacted document they knew Defendants filed in redacted form, counsel does not have confidence those documents will remain sealed without an explicit court order directing Kerkorian's counsel to not publicly disseminate them.  *See ECF No. 16–1* at 15:22–20:14; ECF No. 15–12 at 6–11 (and potentially 1–5); ECF No. 1 at 319; **Ex. B at 6 n. 2**.

[10] *Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020); *Marlowe v. LeBlanc*, Case No. 20-30276, ___ Fed. Appx. ___, 2020 WL 2043425 (5th Cir., April 27, 2020).

[11] *Swain v. Junior*, 958 F.3d 1081 (11th Cir. 2020).

[12] *Maney v. Brown*, Case No. 6:20-cv-00570-SB, 2020 WL 2839423 (D. Ore., June 1, 2020) (citing *Swain*, 958 F.3d at 1090).

[13] *Roman v. Wolf*, 2020 WL 2188048 (9th Cir., May 5, 2020).

from this Court and throughout the nation[14] concluding the injunctive relief being sought by Kerkorian is not medically or legally required or appropriate.

This Court should follow its previous conclusion in *Williams*, the Nevada Supreme Court[15] and the great weight of cases that have rejected similar claims, to deny the instant Motion.

## II. STATEMENT OF FACTS

Kerkorian has included Defendants' opposition in the *Williams* case as Exhibit 5 to his Motion[16] and as Exhibit 4 to the Complaint.[17] Kerkorian also attached to Defendants' Response before the Nevada Supreme Court.[18] However, that response was replaced due to the Supreme Court's request that Defendants respond to the injunctive relief sought by Amici,[19] and therefore Defendants have attached the Replacement Brief, which is the operative brief.[20] For sake of brevity, Defendants incorporate the in *Williams* opposition and the Replacement Brief as if fully set forth herein.

### A. Kerkorian's Health Does Not Place Him in a High Risk Category

Kerkorian alleges—without medical records or opinion—that he is an "immune compromised inmate."[21] Specifically, he asserts that his high blood pressure and psoriasis diagnoses qualify him as an "immunocompromised person" that is "highly susceptible to death or serious pain from COVID–19."[22]

---

[14] **Ex. B at 4–6 n. 1** (citing sister state cases as well as one case from this Court); *see also, e.g.*, *United States v. Boatwright*, ___ F. Supp. 3d ___, 2020 WL 1639855, * 9 (D. Nev. April 2, 2020) (no evidence inmate is safer being released than remaining in custody); *United States v. Knight*, ___ F. Supp. 3d ___, 2020 WL 167959, * 3 (D. Nev. April 6, 2020) (citing *United States v. Martin*, ___ F. Supp. 3d ___, 2020 WL 1274857, at *3–4 (D. Md. 2020) ("finding that defendant's confirmed medical conditions alone are insufficient to rebut Government's proffer that correctional and medical staff are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID–19 virus"); *Centofani v. Neven*, Case No. 2:13-cv-01080-JAD-PAL, 2020 WL 2114360, at * 3 n. 36 (D. Nev. May 4, 2020), *app filed* May 29, 2020 ("no evidence that the NDOC would not be able to transport COVID–19 positive inmates who need medical support to local hospitals" and it is speculation to conclude inmate is safer in the community than inside the prison and also declining to mandate "widespread testing"). These cases are merely a sample of the dozen of cases involving COVID–19 filed in this Court, many of which address cases from outside this jurisdiction.
[15] **Ex. B at 4–6.**
[16] ECF No. 15–5.
[17] ECF No. 1 at 195–215. ECF No. 1 does not comply with LR IC 2–2(a)(3)(A).
[18] ECF No. 1 at 216–282.
[19] Amici's Brief is attached hereto as **Exhibit O**.
[20] Replacement Brief, attached hereto as **Exhibit D**.
[21] ECF No. 16–1 at 2:10; *see also* ECF No. 15–1 (no reference to psoriasis or high blood pressure referenced as even general risks let alone to Kerkorian specifically; *see also* ECF No. 1 at 66–78.
[22] *Id*. at 4:20–5:6–5:1.

However, Kerkorian has not provided any medical evidence for the proposition that either high blood pressure or psoriasis put him in a high risk COVID–19 category.[23]

Dr. Minev[24] has reviewed Kerkorian's medical records.[25] That review confirms that while Kerkorian is seventy–four (74) years old,[26] he was only recently prescribed 10 mg of Norvasc for high blood pressure.[27] His medical records also reveal (1) no history of an immunocompromised illness, (2) a self-denial of any "knowledge of heart problems;" (3) a recent physical examination noting that his cardiovascular system was "normal;" and (4) psoriasis limited to "dry," "crusting" or "flaky" skin on his legs.[28]Presently, the National Psoriasis Foundation (NPF) states psoriasis patients "not on an immunosuppressive medication . . . there *may be minimal* additional risk of contracting COVID–19."[29] The CDC and WHO have not taken a position regarding what, if any, effect psoriasis may have on COVID–19 susceptibility.[30] And further, there is a disagreement between the NPF and the International Psoriasis Council as to whether those with psoriasis should stop taking medications to control it even after receiving a COVID–19 diagnosis.[31]

### B. Kerkorian's Living Conditions

Kerkorian is housed by himself in SDCC's Unit 3.[32] The cell has its own toilet and sink.[33] Kerkorian also has a television.[34] This means that in addition to the COVID–19 education memorandum posted in Kerkorian's housing unit, he also has access to COVID–19 information via the close circuit

---

[23] *Id*. at 5:8–19.
[24] NDOC's Medical Director.
[25] **Exhibit E, Dr. Minev Decl. at 7–8, ¶¶ 19–22.** Kerkorian's medical records are not being filed due to concerns Kerkorian's counsel will not respect the need to file such documents under seal (*see* n. 8). Should the Court wish to view them, Defendants respectfully request the Court issue an order permitting them to be filed under seal with a specific admonition to Kerkorian's counsel they not be disseminated. Of course, Defendants note Kerkorian was free to seek these medical records had he reasonably believed they would be helpful. He did not do so. **Ex. E at 7, ¶ 19.**
[26] Not seventy–three (73) years old as stated in the Motion. ECF No. 16–1 at 5:5–6. Defendants note that on several pages of the Motion, the text is between the line numbers. Defendants have therefore provided this Court with both line numbers in those situations.
[27] **Ex. E at 7, ¶¶ 20–21.**
[28] *Id*. at 7, ¶ 20.
[29] https://www.psoriasis.org/advance/coronavirus, last accessed June 8, 2020.
[30] **Ex. E at 8, ¶ 22.**
[31] **Ex. E at 7,** ¶ 21; *see also* https://www.medicalnewstoday.com/articles/psoriasis-and-covid-19#is-covid-19-more-dangerous, last accessed June 8, 2020.
[32] **Exhibit F,** Warden Howell Decl at 2, ¶ 6 and Housing Unit Roster at Attachment 2.
[33] *Id*. at 2, ¶ 10 and Photographs at Attachment 3.
[34] *Id*. at 3, ¶ 11.

inmate television channel, where it runs on a continuous loop.[35]  Photographs of his cell show a sanitary cell.[36] The sanitary conditions should be of no surprise given the cleaning supplies available to him.[37]

### C.    NDOC's Updated COVID–19 Policies and Procedures

The Complaint incorporated Warden Howell's opposition in *Williams*.[38] That response details the proactive, progressive policies and procedures initially put in place by Dr. Minev and NDOC to combat the spread of COVID–19 within NDOC institutions.[39] These policies will not be restated here.

### 1.    Current COVID–19 Positive Tests of Employees and Inmates

Due to these aggressive procedures, only **eight** (8) NDOC **inmates** (out of an inmate population of over 12,000) have test positive for COVID–19.[40]  None of these inmates are housed at SDCC.[41]  In addition, out of approximately 2,700 correctional officers and staff, only thirty (30) employees and one contractor have tested positive for COVID–19.[42]  Only one of these positive tests involved an employee at SDCC – and that test was over two months ago, on April 7, 2020.[43]  The correctional employee had not worked at SDCC since March 20, 2020–a full seventeen (17) days prior to testing positive for COVID–19.[44] The officer has not yet been cleared to return to work.[45]

---

[35] **Ex. F at 2–3, ¶¶ 5, 11**.

[36] *Id*.

[37] ECF No. 1 at 306–308 at ¶¶ 12–17; **Ex. C at 27–32**; **Ex. F at 3–5, ¶¶ 13–18,** and Attachments 4–6; *see also Williams*, ECF No. 9 at 5:1–6:13.

[38] ECF No. 1 at 195–215.

[39] *Id*. at 198–208 (4:1–14:22)..

[40] *Williams*, ECF Nos. 25, 26, 30.

[41] *Id*.

[42] *Williams*, ECF No. 27 at 3:7–18, ECF Nos. 16–26, 30–31; **Ex. E at 6, ¶ 16; Exhibit H, Director Daniels Decl. at 1, ¶ 2**.

[43] **Ex. E at 6, ¶ 17;** *see also* ECF No. 1 at 296 (1:18–21). Williams, ECF No. 10 at 1:21 (under seal filing).  Defendants have no objection to the date contained in the under seal filing being made public. Defendants continue to respectfully request that none of the other information contained in that document be made public except as already done so with the filing of *Williams*, ECF No. 12–1.

[44] **Ex. E at 6, ¶ 21**.

[45] **Ex. E at 6, ¶ 17; Ex. F at 6, ¶ 21**. For safety and security reasons, the correctional officer's precise duty stations will not be set forth in this document, however, the Court is aware of this information based on the previous under seal submission made in *Williams*, ECF No. 10 at 3:2–7, 12 at 10 (under seal). Defendants are willing to make known that as a correctional officer, the correctional officer may have been assigned to any unit, including Kerkorian's unit, up through the employee's last date of work on March 20, 2020. **Ex. F. at 6, ¶ 21**.

### 2. Updated COVID–19 Policies and Procedures

NDOC "is constantly reviewing and revising its COVID–19 protocols in an effort to stay ahead of the rapidly changing conditions" in dealing with this global pandemic.[46] As part of those changes, NDOC has implemented additional protocols since the filings in *Williams* and the Nevada Supreme Court rejected Kerkorian matter.[47] These include:

#### a. Access to Hand Sanitizer

As of April 8, 2020, all inmates have access to hand sanitizer.[48] This hand sanitizer was first made available to inmates to keep on their person, however due to inmates drinking it to become intoxicated, policy was changed to provide it to any inmate upon request in the presence of a correctional officer.[49] Warden Howell confirms that this hand sanitizer is available to all inmates, including Kerkorian.[50] The hand sanitizer being provided to all inmates is being manufactured by inmates in conformity with the guidance and recommendations from both the WHO and the FDA.[51] The hand sanitizer formula calls for a minimum alcohol content of 75%,[52] well in excess of the 60% minimum Kerkorian demands.[53]

#### b. All Staff Must Use Personal Protection Equipment (PPE)

As of April 27, 2020, the use of PPE became mandatory for all NDOC staff that has any inmate contact or within the "secured perimeter."[54] Warden Howell confirms this is being enforced at SDCC.[55] Prior to this change, it was mandatory for all staff involved in the screening process to wear it.[56]

#### c. Use of N95 Masks

N95 masks are mandatory and used by all correctional officers involved in the transportation of inmates off NDOC grounds for any reason regardless of whether the inmate is COVID–19 positive or suspected to be positive. N95 makes are also required when transporting or transferring an inmate

---

[46] ECF No. 1 at 212:5–8.
[47] **Ex. E at _____ and Policy Revision Emails and Memos as Attachment _____ thereto.**
[48] **Ex. E at 4, ¶ 15(a); Exhibit G,** Deputy Director Quenga Decl. at 2, ¶ 6; **Exhibit J,** Deputy Director Wickham Decl. at 2, ¶¶ 7–8.
[49] **Ex. H at 2–3, ¶¶ 9–10; Ex. J at 2, ¶ 7.**
[50] **Ex. F at 5 ¶ 19.**
[51] Ex. G at 2–3, ¶¶ 8–10 and Attachments 1 and 2.
[52] *Id.*
[53] ECF No. 16–1 at 8:3, 26 at ¶ e.
[54] **Ex. H at 3, ¶ 11 and Attachment 1 thereto; Ex. J at 3, ¶ 11 and Attachment 2 thereto.**
[55] **Ex. F at 6, ¶ 24(b).**
[56] **Ex. E at 4, ¶ 15(b).**

internally when the inmate has either has tested positive for COVID–19 or is suspected to have been exposed to COVID–19.[57]  Warden Howell confirms this policy is being followed at SDCC.[58]

### d. All Inmates are Being Provided Masks

On May 19, 2020, NDOC initiated a policy of providing all inmates with masks.[59] This policy is quite telling as to the seriousness in which NDOC is handling this pandemic, as facial coverings for inmates present a safety and security risk that must be mitigated.[60]

To comply with this policy, on June 4, 2020, 3,750 masks for inmate use were shipped to Northern Nevada Correctional Center (NNCC) and 1,160 were shipped to Warm Springs Correctional Center (WSCC).[61] On June 5, 2020, Ely State Prison (ESP) was sent 2,880 masks for inmate use.[62] 2,158 masks were sent to Florence McClure Women's Correctional Center (FMWCC) on the same date and for the same purpose.[63]  On June 8, 2020, Northern Nevada Transitional Housing (NNTH) and SDCC were ship 164 masks and 903 masks, respectively.[64]  These masks are again earmarked solely for inmate use.[65] High Desert State Prison (HDSP) received its full complement of needed masks on or before May 26, 2020, with Lovelock Correctional Center (LCC)—where the masks are being produced—receiving its full requirement on June 4, 2020.[66] With these shipments, anticipated to arrive "no later than Wednesday, June 10, 2020 . . . [a]ll major institutions" will have the needed supply of inmate masks available for their inmates as well as the inmates at the conservation camps under the authority of those institutions.[67]

In all, 22,055 masks for inmate use—nearly double the inmate population—have been provided to NDOC institutions.[68]  NDOC will continue to manufacture and produce masks to ensure that replacement masks are available as needed during the pandemic.[69]

---

[57] **Ex. E at 5, ¶ 15(d)**.
[58] **Ex. F at 7, ¶ 25(c)**.
[59] **Ex. G at 3, ¶ 12; Ex. H at 3, ¶ 11; Ex. J at 3, ¶ 9**.
[60] **Ex. H at 3, ¶ 12; Ex. J at 3, ¶ 9**.
[61] **Ex. G at 3, ¶ 13(a), (b) and Attachment 3**.
[62] *Id.* at 3, ¶ 13(c) and Attachment 3.
[63] *Id.* at 3, ¶ 13(d) and Attachment 3.
[64] *Id.* at 4, ¶ 13(e), (f) and Attachment 3.
[65] *Id.* at 3–4, ¶¶ 13–14.
[66] *Id.* at 4, ¶ 14 and Attachment 4.
[67] *Id.* at 4, ¶ 14 and Attachment 4.
[68] *Id.* at 4, ¶ 14 and Attachment 4.
[69] *Id.* at 4, ¶ 15.

e.    <u>**Quarantine and Return to Work Procedures**</u>

While the quarantine procedures this Court and the Nevada Supreme Court were informed of in the previous filings are still generally in place,[70] due to the passage of time and evolving practices, the following additional information is being provided to clarify language that may not have been clear in the previous filings or because those procedures have become more stringent due to the ongoing crisis.

**(1)    Employee Quarantines**

All COVID–19 positive employees are required to quarantine for at least fourteen (14) days.[71] If the individual is still symptomatic, they must remain quarantined until such time as they are showing no symptoms for a 72 hour period.[72] In addition, two negative COVID–19 tests, separated by 48 hours, are now required before an employee is permitted to return to work.[73] For correctional officers who have not tested positive, but that have been in close contact with a positive COVID–19 patient, those individuals are required to self–quarantine for 14 days and also be symptom free for at least 72 hours, whichever is greater, before returning to work.[74] While these employees are not always required to obtain a negative test before returning to work, like all medical issues, Dr. Minev reserves the right to require a negative test of these individuals should the circumstances warrant.[75]

As with all medical situations, medical personnel must have flexibility to review all circumstances on a case by case basis.[76] And that is why regardless of the amount of negative testing that may or may not be required before returning to work, each employee must obtain medical clearance from Dr. Minev or his designee prior to returning to work.[77]

**(2)    Inmate Quarantines**

Inmates who test positive—a total of eight (8) (and none at SDCC)—are quarantined either in medical or in a quarantine unit as instructed by medical staff.[78] No inmate who has tested positive has been released from quarantine. Dr. Minev continues to evaluate these situations in order to develop a

---

[70] *See* ECF No. 1 at 198:1–208:22 (4:1–14:22); **Ex. A at 11-32, 39–40; Ex. E at 2–4, ¶¶ 3–15**.
[71] **Ex. E at 5, ¶ 15(e)**.
[72] *Id.*
[73] *Id.*
[74] *Id.* at 5, ¶ 15(f).
[75] *Id.*
[76] *Id.*
[77] *Id.* at 5–6, ¶¶ 15(e),(f), 16.
[78] *Id.* at 5, ¶ 15(g).

comprehensive and medically sound policy regarding how to transition any positive inmate back into general population.[79]

As to inmates who have had close contact with a COVID–19 positive individual, those inmates are quarantined for a minimum of fourteen days.[80] Dr. Minev and medical personnel are also considering what additional steps are necessary before releasing the quarantine from any of these inmates as the safety of is of paramount importance .[81]

### f.  NDOC Wide Testing Of Everyone

On May 27, 2020, NDOC announced that it would begin testing all inmates and employees for COVID–19.[82] As of the date of this filing, all HDSP inmates have been tested (results are pending) with all HDSP staff expected to be completed by June 14, 2020.[83]

Inmates housed in the infirmaries at NNCC and FMWCC have also been tested, as well as all inmates who are pregnant, on chemotherapy or dialysis, or who have left any facility for an outpatient visit.[84] Inmates and staff within one wing Wells Conservation Camp, and all inmates and staff at Tonopah Conservation Camps have been tested.[85] Comprehensive testing at LCC began on June 4, 2020 and was completed on June 9, 2020.[86] Testing at SDCC began on June 8, 2020 and is anticipated to be completed within 5-10 days.[87] The remaining institutions will be scheduled following the completion of SDCC testing or as resources become available, whichever occurs first.[88]

### 3.  Nevada Sentencing Commission Members Attend A Town Hall Meeting

NDOC informed the inmate population that NDOC would host town hall meetings to provide them with up-to-date COVID–19 information.[89] Kerkorian suggests without any evidence these may not

---

[79] *Id.*
[80] *Id.* at 5–6, ¶ 15(h).
[81] *Id.* at 5–6, ¶¶ 15(h), 16.
[82] **Exhibit N, NDOC Press Release, dated May 27, 2020;** *see also* http://doc.nv.gov/uploadedFiles/docnvgov/content/About/Press_Release/NDOC_Expands_COVID19_Testing.pdf, last accessed June 10, 2020.
[83] Declaration of M. Forero at 2, ¶ 7, attached as **Exhibit M**; *see also* **Ex. E at 5, ¶ 15(i).**
[84] **Ex. M at 3, ¶ 13; Ex. E at 5, ¶ 15(i).**
[85] **Ex. M at 2, ¶ 8; Ex. E at 5, ¶ 15(i).**
[86] **Ex. M at 2, ¶ 9; Ex. E at 5, ¶ 15(i).**
[87] **Ex. M at 2, ¶ 10; Ex. E at 5, ¶ 15(i).**
[88] **Ex. M at 3, ¶ 11; Ex. E at 5, ¶ 15(i).**
[89] ECF No. 1 at 202:13 (8:13).

be occurring as he asserted that NDOC "supposedly began holding town hall meetings with inmates."[90] However, as Director Daniels has confirmed multiple town hall meetings have taken place at every institution.[91] Warden Howell confirms they have taken place at SDCC every Tuesday and Friday since March 18, 2020, with Kerkorian permitted to attend any meeting held in Unit 3.[92]

Director Daniels invited members of the Nevada Sentencing Commission to attend a town hall meeting.[93] At least two members did so on April 24, 2020. Both of them spoke about the experience at the Nevada Sentencing Commission Public Hearing held on April 29, 2020.[94] One of the members, Kimberly Mull, noted that while she was a high–risk individual, she felt it important to go see what was happening "on the ground." She is not only a member of the Nevada Sentencing Commission, but also a daughter of a former correctional officer employee and sister of a former inmate. She informed the public that upon arrival at HDSP her temperature was taken as part of the screening process. She was also asked a serious of health assessment questions and about potential COVID–19 exposure. She was offered a mask and hand sanitizer. While waiting for the screening process, she also had the opportunity to speak to correctional officers and provided her with positive reviews of the safety procedures put in place, which has resulted in very few sick calls.

Once arriving at the town hall meeting area, she observed approximately 120 inmates, listened to Director Daniels provide updated information regarding COVID–19 and answer questions from inmates. Mull also confirmed inmates were able to obtain hand sanitizer upon request (due to inmate abuse) and noted that inmates were encouraged by the procedures in place to isolate inmates upon intake for a period of 14-20 days before implementation.  She informed members of the committee and the public that inmates generally seemed more concerned about the health and safety of their family members on the "outside" as opposed to their own health. Mull also recalled inmates being asked about more widespread use of masks among inmates and explaining why hand washing as opposed to gloves may be more effective.  She also commented that there was plenty of room for inmates to practice social distancing in the meeting if they chose to do so. She stated that "overall, it was very impressive" regarding what she

---

[90] ECF No. 16–1 at 9:25–10:1.
[91] **Ex. H at 4, ¶ 16**.
[92] **Ex. F at 7, ¶ 27**.
[93] **Ex. H at 4, ¶¶ 17–18**.
[94] *See* n. 95, *infra*.

was seeing and what NDOC had implemented. Mull also reported the undisputed fact that NDOC was the first institution to implement visitation restrictions. She left "very impressed" with the steps implemented and that she felt "very safe even as a" high-risk individual. In fact, due in her opinion, because of the aggressive steps taken by NDOC "first," she believes NDOC should receive national recognition for its COVID–19 response.[95]

Chief Justice Hardesty, chair of the Nevada Sentencing Commission, also took the opportunity to thank Director Daniels and noted that Mull had provided "very helpful insight."[96] Following Chief Justice Hardesty, another committee member, John Ponder, also thanked and congratulated Director Daniels and how receptive the inmates were to him and his interaction with them.[97]

### 4. Emergency Operation Centers

Deputy Director Wickham confirms all institutions set up Emergency Operation Centers (EOCs) as instructed.[98] The EOC contact information was provided to each institution on March 17, 2020.[99]

### D. Response to Kerkorian's Use of Confidential Information

Kerkorian spends several pages of his Motion discussing information his counsel admits Defendants "inadvertently filed without clearing the meta data from the document."[100] Kerkorian used this information despite admitting it was provided in error, and while acknowledging Defendants' counsel informed them it should not be used unless an agreement could be reached.[101] The Nevada Supreme Court made clear in its unanimous rejection of Kerkorian's mandamus petition that the "*unredacted reply*" filed by Kerkorian would be stricken. It further directed that the court clerk "shall not accept for filing any *unredacted* version."[102]

---

[95] https://youtu.be/5b-acfQ-mvM?t=6147, last accessed on June 8, 2020, 1:42:28–1:52:33. As a public meeting, this Court may take judicial notice of this recording. *Bayview Loan Servicing, LLC v. Shadow Springs Comm. Ass'n.*, 425 F. Supp.3d 1275, 1284 (D. Nev. 2019); *DeHoog v. Anheuser–Busch InBev SA/NV*, 889 F.3d 758, 763 n. 5 (9th Cir. 2018); *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010). In addition, Kerkorian has relied on a different portion of this public hearing. *See* ECF No. 16–1 at 20–21 nn. 98–100, 102–103.

[96] https://youtu.be/5b-acfQ-mvM?t=6147 at 1:53:00–1:53:22.

[97] *Id*. at 1:53:23–1:54:42.

[98] ECF No. 1 at 202:5–22 (8:5–22); **Ex. J at 2, ¶ 5.** A description of what the EOC' purpose is contained within Warden Howell's Declaration, **Ex. F at 7, ¶ 26.**

[99] **Ex. J at 2, ¶ 5.**

[100] ECF No. ECF No. 16–1 at 15:22–20:14; *see also* ECF No. 15–12 at 6–11.

[101] ECF No. 1 at 319–20.

[102] **Ex. B at 6 n. 2 (emphasis in original).**

Despite these clear admonitions, here, Kerkorian has again chosen to rely on the unredacted information inadvertently provided to him. Defendants' counsel emailed Kerkorian's counsel requesting they take immediate steps to either remove this information from the Complaint and Motion or seek to have the information sealed.[103] Kerkorian's counsel rejected that request, arguing they need not do so since some of the information was reported by a media source.[104] However, this is of no import (1) as the media had reported the information on Friday, April 24, 2020—six days *before* the Nevada Supreme Court concluded it should stricken and not permitted to be filed; (2) the media description does not provide the entirety of the information;[105] and (3) the media is not an officer of the court.

Defendants will not provide a count by count retort of the confidential information. Rather, Defendants note that nothing in the improperly provided information sheds any light on the conditions of confinement facing Kerkorian. Indeed, the only information regarding SDCC in the unredacted information provides support for NDOC's arguments that they have implemented strong, stringent policies in an effort to combat COVID–19.[106]

### E.     Response to the November 12, 2019 Report and *Stockmeier v. Green*

Kerkorian has also relied on NEV. REV. STAT. 209.381 in an effort to obtain an injunction based on state law claims.[107] That statute requires the noncontroversial and undisputed requirement that NDOC provide inmates with a healthful diet and sanitary housing. *Id*. While Kerkorian has relied on an annual inspection report[108] to assert that these things are not occurring, he has not alleged that he himself is not obtaining an appropriate diet or that he lives in unsanitary conditions—the photos of his cell explicitly reject any such claim Kerkorian may have attempted.[109] Nonetheless, and putting aside the lack of any

---

[103] **Exhibit I,** Email to Kerkorian's counsel, dated June 8, 2020.

[104] **Ex. I,** Kerkorian's counsel's response, dated June 8, 2020.

[105] Defendants' counsel is aware of the date and substance of the article given the phone discussions and text messages with various members of the NDOC administration following the article's dissemination. A review of that article also notes that Kerkorian's counsel cooperated with the media be provided an interview regarding the information. This information can be further provided to the Court under seal or *in camera* if the Court believes it is necessary to have further confirmation as to the date and content.

[106] The citation for this allegation is Kerkorian's unredacted transcript provided to this Court—improperly according to Defendants. Defendants do not wish to bring attention to this document further, and therefore respectfully requests the Court's indulgence in not providing a particular cite to this information.

[107] ECF No. 16–1 at 22:23–24:11.

[108] ECF No. 15–13.

[109] **Ex. F at 2–4, ¶¶ 6, 10, and Photographs at Attachment 3**.

1   medical support that these violations would cause Kerkorian to be at a higher risk for COVID–19, Deputy

2   Director Wickham has confirmed that each of the violations referenced in the report have been

3   corrected.[110]

4          Kerkorian also failed to make clear that the inspection report is completed by the Chief Medical

5   Officer (CMO) of the State of Nevada, not any NDOC employee.[111]   Likewise, *Stockmeier* did not

6   involve NDOC or of its employees.  Rather, the only defendant was Nevada's CMO.[112]   Further, to the

7   extent Kerkorian relies on *Stockmeier* for any issues relating to the diet NDOC inmates previously

8   received, the ruling noted the CMO provided "no recommendations."[113] Nonetheless, recommendations

9   were eventually provided to NDOC, and they were implemented in a new menu unveiled on August 3,

10  2019 with additional revisions made based on inmate feedback in January 2020.[114]

11  **III.    LEGAL STANDARD REGARDING INJUNCTIVE RELIEF**

12         Injunctive relief, whether temporary or permanent, is an "extraordinary remedy, never awarded

13  as of right."  *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a

14  preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

15  irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and

16  that an injunction is in the public interest."  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d

17  1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

18         Furthermore, under the Prison Litigation Reform Act ("PLRA"), preliminary injunctive relief

19  must be "narrowly drawn," must "extend no further than necessary to correct the harm," and must be "the

20  least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2).  The court shall give

21  substantial weight to any adverse impact on public safety or the operation of a criminal justice system

22  caused by the preliminary relief." *Id*. "[T]here must be a relationship between the injury claimed in the

23

24         [110] **Ex. J at 3, ¶ 10**.
            [111] Nev. Rev. Stat. 209.382; *see also* ECF No. 15–13 at 1 (citing Nev. Rev. Stat. 209.382,
25  444.330, and 446.885).
            [112] *Stockmeier v. Green*, 130 Nev. 1003, 1005, 340 P.3d 583, 584 (2014) ("NRS 209.392 . . .
26  requires respondent, Nevada's Chief Medical Officer, to periodically examine. . .."); *Stockmeier v. Green*,
    2018 WL 3629306, * 1–2, 422 P.3d 1233 (table) (2018) (unpublished) (listing only the CMO as a
27  defendant and finding only the CMO in contempt).
            [113] *Stockmeier*, 130 Nev. at 1006, 340 P.3d at 585 ("the letter indicated that [the CMO] had 'no
28  recommendations' for improving the inmate diets").
            [114] **Exhibit K,** Memoranda re: New Diet, dated July 3, 2019 and January 22, 2020.

1    motion for injunctive relief and the conduct asserted in the underlying complaint." *Pac. Radiation*

2    *Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 635–36 (9th Cir. 2015).

## IV.    KERKORIAN FAILED TO EXHAUST ADMINISTRATIVE REMEDIES

         As a preliminary matter, before addressing why each of *Winter* factors weigh against issuing an

injunction, Defendants note Kerkorian's failure to seek any administrative relief under the PLRA by way

of filing either an emergency or informal grievance, at least calls into question whether Kerkorian has

properly exhausted his administrative remedies as required under the PLRA.  While COVID–19 certainly

involves a rapidly changing legal and medical circumstance, Kerkorian never sought administrative relief

from the NDOC prior to filing the instant lawsuit or motion. COVID–19 has been a cause for concern

since at least March of 2020 when the Governor of Nevada and the President of the United States both

declared state of emergencies due to the global pandemic, resulting in unprecedented stay at home orders

and directives being issued throughout the nation, and indeed the world.

         At least two Circuits have addressed the PLRA exhaustion requirement in the context of COVID–

19.  In *Swain v. Junior*,[115] the court noted in dicta that "the district court likely erred in declining to

address PLRA exhaustion at the preliminary injunction stage."[116] In addition to referencing *Ross v.*

*Blake*,[117] the Eleventh Circuit noted the district court's decision to not address the exhaustion issue "at

the preliminary injunction stage . . . was misguided."[118]  In the reasoning of the Circuit, the district court

could not conduct an appropriate inquiry into whether the plaintiffs were likely to succeed on the merits

of "their § 1983 claim, without, at the very least, finding that the defendants were unlikely to carry their

burden of establishing failure to exhaust."[119]

         Similarly, in *Valentine v. Collier*,[120] the Fifth Circuit noted the plaintiffs "face[d] several obstacles

to relief under the" PLRA, including "exhaustion and narrowness."[121]  *Valentine* then confirmed that the

---

[115] 958 F.3d 1081 (11th Cir. 2020).
[116] *Id.* at 1091–92.
[117] 136 S. Ct. 1850, 1856 (2016).
[118] *Swain*, 958 F.3d. at 1092.
[119] *Id.* (citing *Gonzales v. O Centro Espirita Benficente Unioa do Vegatal*, 546 U.S. 418, 428–29 (2006).
[120] 956 F.3d 797 (2020).
[121] *Id.* at 804.

three *Ross* factors[122] are the only situations in which administrative remedies are not available.[123] It then announced that under those standards, the plaintiffs' "suit appears premature."[124] *Valentine* reached this conclusion even though the district court "considered the [grievance] process too lengthy to provide timely relief, and therefore incapable of use and unavailable under the special circumstances of the COVID–19 crisis."[125] As the appeals court noted, the district court holding in that regard was error as it attempted to revive "the rejected portions of the old [special circumstances] regime" rejected in *Ross*.[126]

Justice Alito has also implied that administrative remedies must also be completed by inmates despite the COVID–19 crisis.[127] Justice Alito's statement in this regard occurred when the Court denied the request to vacate a COVID–19 injunction stayed by the Fifth Circuit, where, like *Valentine*, the court noted the district court's PLRA exhaustion analysis ran "counter to Supreme Court precedent."[128]

Further, *Valentine* rejected the district court's reliance on Judge Posner's hypothesis "that administrative remedies might 'offer no possible relief in time to prevent . . . imminent danger from becoming an actual harm,'"[129] concluding that the hypothetical was a red herring. Similarly, here, Kerkorian had months to seek administrative relief. But he sat on his hands, deciding instead to first seek improper mandamus relief before the Nevada Supreme Court, and then—two months later—seek this Court's intervention without following the PLRA requirements.

What's more, Kerkorian chose to come before this Court in an effort to collaterally attack the Nevada Supreme Court's reasoning and guidance to him that he should seek state administrative remedies.[130] This Court should not ignore Kerkorian's failure to do so.

---

[122] These factors are when (1) the procedure is a "dead end" because the officials do not have the requisite authority to provide relief, (2) the grievance procedure scheme is too opaque for an inmate to use, or (3) when prison officials "tak[e] advantage of a grievance process through machination, misrepresentation, or intimidation." *Valentine*, 956 F.3d at 804 (citing *Ross*, 136 S. Ct. at 1859–60).

[123] *Valentine*, 956 F.3d at 804.

[124] *Id.*

[125] *Id.* at 804–05.

[126] *Id.* at 805.

[127] *Marlowe v. LeBlanc*, ___ S. Ct. ___, 2020 WL 2780803 at * 1 (May 29, 2020) ("Nothing in this order should be construed to preclude applicant [the inmate] *from filing a grievance* setting out specifically the relief he requests be provided to him in the prison, and in the event that such request is filed, it should be decided promptly") (emphasis added).

[128] *Marlowe*, 2020 WL 2043425 at * 3.

[129] 956 F.3d at 805.

[130] **Ex. B at 5–6.** To be sure, the Supreme Court did not specifically reference the grievance process, but its guidance certainly should have put Kerkorian and his counsel on fair notice of the need to seek administrative remedies.

## V.   NO INJUNCTION SHOULD ISSUE

Regardless of the valid exhaustion concern, Kerkorian is not entitled to injunctive relief as none of the *Winter* facts weigh in his favor: (1) he is not likely to win on the merits; (2) he cannot establish irreparable harm in the absence of this preliminary injunction; (3) he cannot establish that the balance of the equities tip in his favor; and (4) he cannot establish that any injunction is in the public interest.

### A.   Kerkorian Is Not Likely to Succeed on the Merits

As best as Defendants can surmise, Kerkorian takes umbrage with the COVID–19 procedures and policies put in place by NDOC.  Given that Nevada is at the forefront of the nation in responding to COVID–19, he is not likely to succeed on the merits.

To establish an Eighth Amendment constitutional violation for allegedly failing to prevent harm, Kerkorian must establish that the alleged deprivations, e.g., failure to take steps to prevent COVID-19 at SDCC, are objectively "'sufficient serious,' in that the inmate must show that he was incarcerated under conditions posing substantial risk of serious harm," and that "the official . . . acted with a 'sufficiently culpable state of mind.'" *Famer v. Brennan*, 511 U.S. 825, 834 (1994). While not directly a medical indifference case, Kerkorian's claims are best analogized to such a claim, as it involves the NDOC's implementation of medical policies and procedures put in place to protect him and others from the spread of COVID–19. In that regard, deliberate indifference is a high legal standard; a medical professional's mistake, negligence, or malpractice is not sufficient to constitute deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  An inmate alleging deliberate indifference to serious medical need "must allege acts or omissions sufficiently harmful" to the inmate. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Prison officials do not violate the Eighth Amendment even in situations where harm may befell an inmate so long as the officials "responded reasonably to the risk." *Farmer*, 511 U.S. at 844.

Here, NDOC concedes that while COVID-19 is a serious medical condition, there is no evidence that Kerkorian has COVID–19. Thus, the question is not whether COVID–19 is serious medical condition, but rather whether NDOC has taken medically reasonable steps to help prevent Kerkorian and all other inmates from getting COVID–19. Based on the rapidly-evolving guidance of the CDC, Dr. Minev has instituted practices and protocols to, as best as possible, keep COVID–19 from getting a

foothold with NDOC institutions. Since these protocols substantially comply with CDC instructions, Kerkorian is not likely to succeed on the merits.

### 1. NDOC's COVID–19 Protocols and Procedures

NDOC has also implemented stringent screening procedures the individuals permitted to enter its institutions. These procedures include visual and temperature checks upon entry, prohibiting entry to anyone who is showing symptoms of potential COVID-19, taken measures to sanitize common areas numerous times a day, and ensuring that officers, vendors, and inmates are quarantined, denied access, or isolated and observed away from other inmates when there is any question about the individual's COVID–19 status. Or, in the words of Director Daniels on April 27, 2020, "when in doubt, keep them out."[131]

To be sure, the protocols and procedures implemented are substantially similar to those the CDC published as interim guidance on March 23, 2020.[132] A review of the CDC guidance makes clear the NDOC has used the same definition of someone who is considered to be in "close contact" with a COVID-19 patient[133] and relies on the same symptoms of fever, cough, and shortness of breath.[134] Dr. Minev not only includes these three symptoms, but on April 29, 2020 added "chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell."[135]

The CDC also notes the importance of hygiene, restricting travel and access, cleaning "several times per day," performing visual inspection and temperature checks for all individuals prior to entry into the institution, and ensuring that employees and other outside individuals are not permitted access after showing symptoms "for at least 72 hours" and that 14 days self-quarantines should be instituted.

Dr. Minev has reiterated these CDC procedures are closely followed by him and NDOC staff in implementing the ever changing protocols and procedures putting NDOC in the best possible position to protect inmates and staff from COVID–19.  This includes the requirement of having any correctional

---

[131] **Ex. H at 3, ¶ 11 and Attachment 1 thereto**.

[132] *See Interim Guidance on Management of Coronavirus Disease (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#prevention, last accessed June 8, 2020. Kerkorian has included a copy of this document as **Exhibit 4** to the Motion, filed at ECF No. 15–4.

[133] *Compare* ECF No. 15–4 at 2–3 with ECF No. 1 at 204 (10:1–10 nn. 43–48), 205 (11:15–16), 210 (16:18–23), 211 (17:1–8).

[134] *Id.*

[135] **Ex. E at 4, ¶ 15 and 4/29/2020 Email Found in Attachment 3 at _____**.

officer who has tested positive to not return for work until there have been two negative tests separated in time by a 48 hours, a fourteen day quarantine, *and* being symptom free for at least 72 hours – which requires the quarantine to be longer than 14 days if the officer is showing symptoms on that 12th, 13th, or 14th day of the quarantine.[136]

Warden Howell has also once again confirmed the steps that SDCC has taken to ensure proper hygiene and cleaning. He has also confirmed that the SDCC has implemented Dr. Minev's requirements.

### 2. Substantial Compliance with CDC Guidelines Precludes Injunctive Relief

While Kerkorian claims an injunction should issue to force NDOC to implement all of the CDC guidelines, the CDC guidelines issued to correctional institutions are not designed to be a one–size–fits–all solution. Despite Kerkorian's (unfounded) assertions, NDOC's substantial compliance with the CDC's interim guidance requires this Court to deny the Motion.

This was made clear by the Ninth Circuit in *Roman v. Wolf*.[137] There, the court stayed the preliminary injunction in all respects except to the extent it ordered the defendants to substantially comply with the CDC interim guidance report.[138] Writing in partial concurrence, one judge noted the interim report cannot be adopted in full by all institutions, as it states "in boldface type on the very first page, that '**[t]he guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions**.'"[139] The interim report also states that it "will not necessarily address *every possible custodial setting*."[140]

Unlike here, where the evidence establishes the NDOC COVID–19 protocols substantially comply with the CDC's interim guidance, a review of the underlying findings and conclusions in *Roman* do not establish any compliance with those standards—and also show conditions of confinement drastically different (and not for the better) than those Kerkorian and all NDOC inmates experience.[141] It is also telling what relief the Ninth Circuit stayed. These provisions include:

---

[136] **Ex. E at 5, ¶ 15(e).**
[137] 2020 WL 2188048 (9th Cir., May 5, 2020).
[138] *Id*. at * 1.
[139] *Roman*, *supra* (Collins, J., *concurring in part and dissenting in part*); *see also* **Ex. E at 2, ¶ 4**.
[140] ECF No. 15–4 at ___ (emphasis added).
[141] *See generally*, *Roman v. Wolf*, 2020 WL 1952656 (C.D. Cal., April 23, 2020).

- a mandate that all staff maintain six foot social distancing from each other and detainees;[142]

- a mandate that detainees maintain six foot social distancing whenever possible;[143]

- a requirement that all common areas and shared items "be cleaned and disinfected by a professionally trained cleaning staff;"[144]

- a requirement to provide detainees with training, cleaning equipment and supplies so "the detainee can clean and disinfect . . . on a regular basis, but at least once a day;"[145]

- **requiring all staff to "wear mask and gloves . . . at all times while on duty'"[146]**

- requiring detainees to wear masks and be provided gloves;[147]

- **requiring detainees to be provides with soap, hand soap or hand sanitizer in "sufficient quantities . . . that the detainees never run out of supplies;"[148]**

- **requiring the facility to inform the court of its new cleaning procedures and schedule as well as an operations plan implementing the requirements of the injunction;[149] and**

- **requiring weekly updates be provided to the court.[150]**

These provisions—especially those bolded—are substantially similar to Kerkorian's requests.[151] As the Ninth Circuit stayed the injunction attempting to put them in place,[152] This Court should not make the same mistake, as *Roman* necessitates denial of this Motion.

### 3. The District Court of Oregon Has Denied Similar Relief

The District of Oregon's recently denied a COVID–19 related preliminary injunction in *Maney v. Brown*.[153] There, one 52 year old inmate who testified on behalf of the plaintiffs noted he "suffer[ed]

---

[142] *See Roman v. Wolf*, Pre. Inj., ECF No. 55 at 3, ¶ 14, attached as **Exhibit L**.
[143] *Id*. at 3, ¶ 15.
[144] *Id*. at 4, ¶ 17.
[145] *Id* at 4, ¶ 18.
[146] *Id*. at 4, ¶ 20.
[147] *Id*. at 4, ¶¶ 21–22.
[148] *Id*. at 5, ¶¶ 23–24.
[149] *Id*. at 5, ¶ 26(B)–(C).
[150] *Id*. at 6, ¶ 28.
[151] *Compare* nn. 129–137 with ECF No. 16–1 at 25–26, ¶¶ d (six feet social distancing), e, j (hand sanitizer), f (daily showers and clean laundry), i (requirement all staff to wear PPE), p, q (provide PPE to inmates), and r and s (requiring independent monitoring and reporting).
[152] *Roman*, 2020 WL 2188048, at *1.
[153] 2020 WL 2839423.

1    from heart disease [requiring] a pacemaker and implanted defibrillator" along with "30 trips to the

2    hospital since 2016."[154] He also noted he was "housed in a dorm–style facility with 80 other medically

3    vulnerable individuals where he sleeps three feet away from others."[155]

4         Despite these undisputed facts, and the possibility the ODOC may not have "responded perfectly

5    'to the COVID–19 pandemic" or done all it could "to keep [inmates] safe,"[156] the court concluded that

6    the plaintiff had not established that the "ODOC ha[d] acted with *deliberate indifference* toward the

7    health risks that COVID–19 poses to those currently in custody."[157] The rejecting the plaintiff's

8    assertions, the court noted ODOC implemented "procedures to fight the spread of COVID–19," including

9    social distancing measures, the purchase of masks for staff and inmates, medical education, prohibitions

10   on visitation, additional cleaning supplies, quarantine procedures, and the use of "negative pressure

11   rooms, and, if necessary local hospitals," for those inmates who test positive.[158] The plaintiffs proffered

12   over fifty declarations that addressed "the current conditions in ODOC's facilities," and many of them

13   noted the difficulties or impossibility of social distancing and inadequate treatment and testing.[159] Yet,

14   in denying injunctive relief, the court noted plaintiffs could not cite "to any evidence to establish that

15   Defendants 'subjectively believed the measures they were taking were inadequate.'"[160] *Maney* also noted

16   it was not deliberately indifferent to not test asymptomatic individuals.[161]

17        *Maney* also noted the significant federalism and separation of power concerns implicated by

18   "[a]ny injunctive relief [the court] could order," particularly when "'running and overseeing prisons is

19   traditionally the province of the executive and legislative branches'" due to "'courts [being] "ill

20   equipped" to undertake the task of prison administration.'"[162]   Based on these constitutional and

21   pragmatic concerns, *Maney* noted the importance of providing respect to "correctional experts with many

22

23        [154] *Id*. at * 1.
24        [155] *Id*. at * 1.
          [156] *Id*.
25        [157] *Id*.
          [158] *Id*. at * 3.
26        [159] *Id*. at * 5–6.
          [160] *Id*. at * 15 (citing *Swain*, 958 F.3d at 1089).
27        [161] *Id*. at * 16 (citing *Wragg v. Ortiz*, ___ F. Supp.3d ___, 2020 WL 2745247, at * 21 (D. N.J.
     2020)
28        [162] *Id*. at * 19 (quoting *Money v. Pritzker*, ___ F. Supp. 3d ___, 2020 WL 1820660, at * 16–19
     (N.D. Ill. 2020) and *Valentine*, 2020 WL 1916883, at * 14).

years of experience in in–depth knowledge, and [that] court involvement *runs the risk of disrupting ODOC's currently COVID–19 response*."[163]

Based on these factors, the court concluded "preliminary injunctive relief [was] not warranted."[164]

### 4.    The Eleventh Circuit Has Also Rejected Similar Injunction Requests

In *Swain v. Junior*,[165] the Eleventh Circuit reversed the district court's grant of injunctive relief as it concluded the government officials—not the inmate—were "likely to succeed" on the merits given the plaintiff "offered little evidence to suggest that the defendants were deliberately indifferent."[166] In reaching this conclusion, *Swain* noted, among other things, that the prison's inability to "'achieve meaningful social distancing'" did not rise to the level of deliberate indifference even when the social distancing policies that were put in place were "'not uniformly enforced.'"[167]

What was important in *Swain* was that the prison had "adopted extensive safety measures such as increased screening, providing protective equipment, adopting social distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures."[168]  Each of these things have been instituted by NDOC. And while Kerkorian attempts to cast aspersions due to his belief there may be some discrepancy enforcement of these policies, there simply is *no evidence* that NDOC is not taking COVID–19 precautions sufficiently serious or that anyone employed by the NDOC is deliberately acting in an indifferent manner regarding those protections.

Accordingly, to the extent Kerkorian wishes to have this Court issue an injunction requiring NDOC to "follow its own laws and procedures . . . [t]he Supreme Court [has] held that the Eleventh Amendment prohibits federal courts from enjoining state facilities to follow state law."[169]  Based on that admonition, even if this Court were to fashion injunctive relief similar in like to what NDOC has implemented in an effort to "'promote compliance'" with their own policies, such an injunction do what *"Pennhurst* plainly prohibits."[170]

---

[163] *Id*. at * 19 (citations omitted; emphasis added).
[164] *Id*. at * 20 (citing *Winter*, 555 U.S. at 20; *Valentine*, 956 F.3d at 802; *Swain*, 958 F.3d at 1090).
[165] 958 F.3d 1081 (11th Cir. 2020).
[166] *Id*. at 1089.
[167] *Id*.
[168] *Id*.
[169] *Valentine*, 956 F.3d at 802 (quoting *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 103–23 (1984)).
[170] 956 F.3d at 802.

**B.**  **Kerkorian Cannot Establish Irreparable Harm**

At best, Kerkorian has set forth a possible future harm. Such speculative future harm "does not meet the standard of showing 'likely' irreparable harm."[171]

The NDOC has implemented aggressive actions to safeguard against the introduction of COVID–19 into any of its institutions. Given the global pandemic has now infected over 7.6 million individuals worldwide, and over 10,000 in Nevada,[172] NDOC's actions not only do not place Kerkorian in a situation of irreparable harm, but arguably, are keeping him safer than non-institutionalized individuals.

A review of the 21–page interim guidance from the CDC shows the substantial similarity between NDOC's aggressive actions and those recommended by the CDC for use in institutionalized settings. Given the reliance on the CDC protocols, and the undisputed fact that NDOC is taking steps to test *everyone regardless of any exposure of symptoms*, Kerkorian cannot establish either that NDOC has objectively placed him at harm or that it is subjectively aware of any harm.

In addition, Kerkorian waited over one month from the time the Nevada Supreme Court rejected his first plea for intervention before bringing this collateral challenge. He also never availed himself of the grievance process.[173] What has happened in the past month? Kerkorian is still housed individually; there is still no known cases of COVID–19 within the SDCC inmate population; and the one SDCC correctional officer who tested positive over two months ago has not returned to work. And perhaps most importantly, Kerkorian has not alleged any change in his physical condition that would lead anyone to believe that he is in more harm now than he was two months ago when he first began his attack on NDOC's COVID–19 measures.

As opposed to Kerkorian, Defendants would face irreparable injury if this Motion is granted. This is because—even putting aside that much of the sought relief is moot,[174] not within the jurisdiction of

---

[171] *Switch, Ltd. v. Firespotter Labs*, Case No. 2:14cv–1727–JAD–NJK, 2014 WL 2586723, at * 2 (D. Nev., Oct. 24, 2014) (citing *Herb Reed Enterprises, LLC v. Florida Entertainment Mgmt., Inc.*, 736 F.3d 1239, 1250–51 (9th Cir. 2013); *see also Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a *possibility of irreparable harm* is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief").

[172] *See* https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6, last accessed on June 12, 2020.

[173] **Ex. F at 7, ¶ 28**.

[174] For example NDOC: (1) has begun mass testing of all inmates (and staff); (2) has used far in excess of the 500 COVID–19 test kits; (3) has educated inmates on the need to practice social distancing;

NDOC, or not legally permissible[175]—this Court would be taking "charge of many administrative decisions typically left to [NDOC and other state] officials."[176] For example, in *Swain*, the injunction "require[d] that the defendants provide each [] inmate with an individual supply of soap and disinfectant products . . . even though [these high-demand supplies] . . . may be more critical at another county facility."[177]  This is precisely what would occur here if this Court were to require as Kerkorian requests, that each inmate be provided a daily shower with "clean personal towels and washrags after each shower" or that each housing unit must be provided with a no touch thermometer.[178] And it is also substantially similar to portions of the *Roman* injunction the Ninth Circuit stayed.

## C.    The Equities Do Not Tip In Kerkorian's Favor

The NDOC has shown that it is constantly reviewing and revising its COVID–19 protocols in an effort to stay ahead of the rapidly changing conditions faced globally. This includes reliance on CDC and other governmental health guidance that changes on a daily—if not hourly–basis.  It would be difficult, if not impossible, for this Court to fashion injunctive relief in an order that would not, in some way, tie the hands of NDOC, which in turn could prevent it from taking swift and decisive action to changing conditions. The implementation of an injunction here would preclude the NDOC from taking the swift action needed to stay ahead of this pandemic. This is the type of micromanagement that the PLRA injunction limitations is designed to avoid.[179] Or, as stated in *Swain*, if this Court were to issue an injunction in this case it would be "assume[ing] the role of 'super-warden.'"[180]

## D.    The Public Interest Weighs Against Granting the Injunction

Finally, the public interest weighs against granting the injunction. The NDOC has taken aggressive action, implemented progressive and proactive protocols, and exhibited the ability to make

---

(4) has remedied the violations referenced in the November 12, 2019 report; (5) requires all staff to wear PPE in areas where inmates have general access; (6) provides hand sanitizer to both inmates and staff that as 75% alcohol content; (7) is providing to all inmates; and (8) requires negative tests before officers return to work. Accordingly, Kerkorian's requests in ¶¶ a, b, d, e, g, i, j, l, m, n, p, and q are effective moot. *See* ECF No. 16–1 at 25–26; *see also Valentine*, 956 F.3d at 802.

[175] The CMO has not been sued and does not work for NDOC. *See* ECF No. 16–1 at 26 at ¶ h. In addition, the Ninth Circuit has stayed injunctive relief substantially similar to Kerkorian's requests. *See* nn. 128–138, *supra*.

[176] *Swain*, 958 F.3d at 1090.

[177] *Id.*

[178] ECF No. 16–1 at 26, ¶¶ f, k.

[179] *See generally Gilmore v. California*, 220 F.3d 987, 999 n. 14 (9th Cir. 2000).

[180] *Swain*, 958 F.3d at 1090.

changes and updates to its procedures and practices to ensure that it is doing its level–best to keep COVID-19 from spreading throughout its institutions. Because NDOC is taking its cue from the CDC and other governmental health organizations, and has, thus far, successfully battled back this disease, the public interest does not weigh in favor of granting the injunction. This is especially true when taking into account the requirement that in the PLRA context, any injunctive relief must be "narrowly tailored" to correct the harm. Here, no harm has been or can be shown.

To this end, *Swain*, noted the appropriate "question is not whether COVID–19 presents a danger to the inmates. . . .The question is instead whether the plaintiffs have shown that they will suffer irreparable injuries that they would not otherwise suffer in the absence of an injunction."[181] Here, the answer to that question, as it was in *Swain*, is that "[n]othing in the record indicates that the defendants will abandon the current safety measures absent a preliminary injunction, especially since the defendants implemented many of those measures before the plaintiffs even filed the complaint."[182]

## VI. CONCLUSION

Kerkorian has not and cannot establish any of the four necessary elements to obtain an injunction. Perhaps most important, Kerkorian cannot show any irreparable harm has come to him or any other inmate based on NDOC's current clinical procedures and practices. In addition, Kerkorian cannot establish how the proposed injunctive relief would prevent him or other inmates from suffering irreparable harm in the future. Indeed, respectfully, given the current state of the pandemic outside the prison walls, and the lack of <u>any positive pandemic patient at SDCC</u>, all current evidence suggests the NDOC's actions to combat this pandemic is working to keep Kerkorian and all other inmates as safe as possible during these difficult days.   The preliminary injunction must be denied.

Dated:  June 12, 2020

Respectfully submitted:

AARON D. FORD
Attorney General

By: /s/ *D. Randall Gilmer*
      D. Randall Gilmer (Bar No. 14001)
      Chief Deputy Attorney General
      *Specially Appearing as Attorneys for*
      *Defendants*

---

[181] *Id*. at 1090–91.
[182] *Id*. at 1091.

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the State of Nevada, Office of the Attorney General, and that on June 12, 2020, I electronically filed the foregoing **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**, via this Court's electronic filing system. Parties that are registered with this Court's electronic filing system will be served electronically.

W. Michael Horvath, Esq.
Draskovich Law Group
815 South Casino Center Blvd.
Las Vegas, NV 89101-6718

Michael J. McAvoyamaya, Esq.
Michael J. McAvoyamaya Law
4539 Paseo Del Ray
Las Vegas, NV 89121

/s/ Natasha D. Petty
An employee of the
Office of the Nevada Attorney General