# EXHIBIT 4 – Declaration of Southern Desert Correctional Center Associate Warden, James Scally

1 AARON D. FORD
Nevada Attorney General
2 D. RANDALL GILMER (Bar No. 14001)
Chief Deputy Attorney General
3 State of Nevada
Office of the Attorney General
4 *Specially Appearing as*
*Attorneys for Warden Howell*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| MARCELL WILLIAMS,<br><br>    Plaintiff,<br><br>vs.<br><br>WARDEN OF SOUTHERN DESERT CORRECTIONAL CENTER, et al.,<br><br>    Defendants. | CASE NO. 2:20-cv-00639-RFB-BNW<br><br>**DECLARATION OF SOUTHERN DESERT CORRECTIONAL CENTER ASSOCIATE WARDEN, JAMES SCALLY** |

I, James Scally, hereby declare based on personal knowledge and/or information and belief, that the following assertions are true.

    1.    I am currently employed with the Nevada Department of Corrections (NDOC), where I am assigned as an Associate Warden of Southern Desert Correctional Center (SDCC). As Associate Warden, I am responsible for assisting the Warden in overseeing all aspects of SDCC. This includes ensuring that all NDOC policies, practices and procedures are implemented and followed by all persons incarcerated with the NDOC and housed at SDCC, SDCC staff, and to the extent applicable, outside vendors, volunteers and visitors to the facility.

    2.    Due to me being an Associate Warden at SDCC, Chief Deputy Attorney General D. Randall Gilmer reached out to me regarding the above referenced lawsuit. I was contacted due to the fact that Warden Jerry Howell is no longer assigned as the Warden at SDCC, and while we have a new Warden who is intimately involved in all aspects of the administration of SDCC, I have personal knowledge of the COVID–19

protocols implemented by the NDOC and initially put in place at SDCC by Warden Howell and can attest to the fact that those policies and procedures remain in effect at this time.

3. Specifically, I have familiarized myself with the declarations that Warden Howell has previously provided to this Court in both this case as well as the case styled *Kerkorian v. State of Nevada Department of Corrections*, Case No. 2:20–cv–00050–RFB–BNW. These documents reviewed by me indicate that they were filed with this Court in either this case or the *Kerkorian* case, as they have affixed at the top margin an electronic stamp that my counsel has informed me is placed on a document when it is filed with the Court. In this regard, I reviewed documents filed in this case with that bear the following the following document number, which my counsel has informed me is generally referred to as an "ECF No." Those numbers are ECF Nos. 6–7, 9, 9–5, and 12–1, and a document that was filed under seal that my counsel informed me was filed at ECF No. 10 and entitled on the first page *Supplemental Report of Warden Howell and the Nevada Department of Corrections, Specially Appearing in Response to the Court's April 10, 2020 Minute Order (ECF No. 7)* and that also bears "EXHIBIT A (Under Seal)" in bold letters, and consist of a total of fourteen (14) pages.

4. In addition to these documents which I understand were filed in this matter, I have also had the opportunity to review the declaration filed by Warden Howell in the *Kerkorian* matter, which consists of fifty–six (56) pages and can be identified on the Court docket for the *Kerkorian* matter as ECF No. 18–6.

5. My review of the documents further identified in ¶¶ 3–4 did not only consist of the declaration of Warden Howell, but also the underlying documents attached to those declarations or if not attached, referenced in those documents. This includes a review of SDCC Operational Procedure (OP) 490 and OP 211B, both of which detail cleaning and sanitization procedures at SDCC. I was familiar with both of these documents prior to my review for purposes of this Declaration as my duties including ensuring compliance with all OPs as well as Administrative Regulations (ARs).

6. After my review of Warden Howell's declarations filed in this case I can attest that his description regarding OP 490 and OP 211B, and how those procedures are implemented at SDCC were true and accurate, and that those procedures remain in place at SDCC despite Warden Howell's reassignment.

7. To clarify further, OP 211B provides the amount, type and frequency of cleaning supplies made available to the inmates and/or staff within housing units. These products are crucial to ensure a healthy and hygienic work and living space. The information contained in OP211B is a true and accurate representation of the types of supplies provided as well as the quantity available for the inmates.

8. It is important to note that these requirements are over and beyond the additional cleaning and hygiene steps Warden Howell put in place at SDCC for all staff to implement during the current COVID–19 pandemic. Those steps included Warden Howell's mandate that all housing units and entry doors to be cleaned at a minimum once every two hours, that the dining rooms and gym be cleaned after every use, and that maintenance areas are mandated to be cleaned at least once every hour. These cleaning time requirements are merely minimums which are often exceeded.

9. I attest that each of the requirements implemented by Warden Howell described in ¶ 9 remain in full force and effect at SDCC.

10. I also reiterate that the procedures set forth in ¶¶ 7–9 are in addition to the general requirements of Operational Procedure 490 (OP 490), effective July 3, 2015. As Warden Howell previously informed this Court, OP 490 makes clear that "[i]t is the responsibility of all staff directly involved in supervising a shop, housing unit or any other area . . . to maintain constant surveillance of that area to ensure acceptable sanitization practices are followed on a daily basis." OP 490.02(1). Staff are also empowered to provide "appropriate protective clothing . . . should reasonable precautions dictate the use of such clothing." OP 490.02(2). And finally, inmates are expected and required to assist in these cleaning efforts by "maintain[ing] sanitary conditions, personal hygiene, and cleanliness," which includes using the "cleaning equipment or material issued to them." OP 490.03(1).

Inmates are also reminded of the requirement to "[r]eport all illness or disease" that may "require treatment." *Id*.

11. Just as Warden Howell noted, the time frames and supplies referenced in OP 211B and OP 490 as implemented by Warden Howell, are minimum requirements, that are often exceeded to ensure a sanitized and safe environment is maintained throughout SDCC.

12. I further attest that SDCC continues to abide by all medical protocols put in place by Dr. Minev. These protocols include the use of masks by all staff members, including the use of N95 masks in certain circumstances. In addition to staff members being required to wear masks, all inmates have been provided with two masks to be used by them, and the use of the masks by inmates is highly encouraged.

13. Based on the allegations Mr. Williams has made in his latest filings with this Court, I spoke with members of the medical staff as well as the correctional staff in order to determine whether SDCC was properly ensuring that COVID–19 protocols were being followed. In particular, I wanted to investigate Mr. Williams assertions that the phone was not being disinfected between uses, as well as other items and areas complained of by he or his witnesses. Based on that investigation, I affirm that the phone and other miscellaneous items (such as handcuffs and trays) are being cleaned and sanitized between use by any inmate. As the phone is a portable phone that is provided to inmates to use in their cell, it is not surprising that Mr. Williams and the other inmates may not see these sanitization procedures, as the cleaning supplies for the phone (and handcuffs) are kept in "the bubble" or other administrative areas of the housing unit outside the view of the inmates.

14. I also investigated claims that man-down calls and other complaints of illness were being ignored. Based on that investigation, I have no reason to believe that this is true. All staff members are fully aware of the importance of ensuring proper medical attention upon being notified of a request by an inmate. In this regard, a review of the Nevada Offender Tracking Information System (NOTIS), a system I am familiar with and

use on a daily basis to perform my job duties, fails to indicate any grievances from any inmate in Unit 8 regarding allegations that requests for medical attention are being denied or ignored by SDCC staff. NOTIS is the database where such grievances would be tracked and stored.

15. I also confirm that SDCC continues to have Town Hall Meetings for all inmates two days per week. During these meetings, inmates are provided updates regarding COVID–19 in order to continue to educate them as to how best to protect themselves from infection as well as to ensure that the inmates are aware of the safety and security measures NDOC and SDCC have implemented in this fight against COVID–19.

16. I also attest that I have never informed any staff member or inmate to not reveal their COVID–19 status. Of course, as a medical condition, staff and inmates have a right to keep this information as confidential as possible, but neither I nor anyone working for NDOC has ever informed people to try to hide their diagnosis. In fact, as every staff member who tests positive for COVID–19 is immediately placed on administrative leave and not permitted to return to work until they have been cleared by Dr Minev or his designee, the allegation is nonsensical as any positive staff member would not be working and therefore would not have the ability to share their positive status with any inmate.

17. I also can confirm that Unit 8 was placed on quarantine status following the inmate housed in that unit testing positive on July 11, 2020. The inmate was immediately removed from Unit 8 and transferred to medical, where I understand he was placed in a negative airflow cell. No inmate within Unit 8 was transferred out of that unit for a minimum of 14 days (this is not to say that anyone has been transferred out as of now, as I only confirmed for the 14 day time frame required).

18. The fact that the inmates in Unit 8 were quarantined and not transferred out of the unit, is different than inmates being transferred into Unit 8. Any transfer into Unit 8 occurred only after the positive inmate had been removed. Further, the unit is a segregated unit and therefore there is little to no social interaction between the inmates outside of their cell. All inmates in Unit 8 eat inside their cell, where they are housed by

themselves. In addition, inmates in Unit 8 are only provided individual outdoor recreation. This recreation takes place in a fenced in area limited to one inmate at a time. These areas are cleaned and sanitized before any other inmate is placed in the area.

19. I declare under penalty of perjury pursuant to 28 U.S.C. section 1746 that the foregoing is true and correct.

EXECUTED this 29th day of July, 2020.

/s/ James Scally*
James Scally
SDCC Associate Warden,
Nevada Department of Corrections

---

\* Pursuant to Temporary General Order 2020-05, entered by Chief Judge Du on March 30, 2020, https://www.nvd.uscourts.gov/wp-content/uploads/2020/03/GO-2020-05-re-COVID-19-Remote-Hearings.pdf, Associate Warden Scally has authorized counsel to affix his electronic signature to this Declaration. If counsel has misconstrued this Temporary Order, of if this Court would prefer a hand signature, one will be provided upon request.